**Jay Robert NASH, Plaintiff,**

v.

**CBS, INC., MCA, Inc.; MCA Television, Ltd.; Universal City Studios, Inc.; William WhiteHead; Harry Butler, Logan Clarke, Bill Dial, Richard Chapman, GEORGE Geiger, Michael Pillar, Defendants.**

**No. 86 C 511.**

United States District Court, N.D. Illinois, E.D.

Jan. 10, 1989.

Martin S. Agran, Agran & Agran, Chicago, Ill., Harvey C. Gordon, Glenview, Ill., E. Leonard Rubin, William Brinks Olds Hofer Gilson & Lione, Ltd., Chicago, Ill., for plaintiff.

William G. Schopf, Jr., Paula Litt, Schopf & Weiss, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

GRADY, Chief Judge.

This copyright case comes before us on two motions: (1) the defendants' motion for summary judgment on Count I, and (2) the defendants' motion to dismiss or, in the alternative, for judgment on the pleadings with respect to Counts II and III. We grant the first motion. We grant in part and deny in part the second motion.

## COUNT I: COPYRIGHT INFRINGEMENT

In order to recover for copyright infringement, plaintiff Jay Robert Nash ("Nash") must prove (1) that he owns a valid copyright in the subject material and (2) that the defendants copied such material. In our previous opinion, *Nash v. CBS*, 691 F.Supp. 140 (N.D.Ill.1988), we addressed only Nash's ability to prove the first element of a copyright cause of action. We concluded that Nash's books contain his "copyrightable" Dillinger Story and that, assuming he possesses all other necessary attributes of copyright ownership,[1] he holds a valid copyright on the Dillinger Story. On this motion, the defendants switch their focus and challenge Nash's ability to prove the second element of his copyright infringement claim. Defendants argue that there is no genuine issue of material fact as to whether they copied Nash's Dillinger Story. Specifically, they assert that "The Dillinger Print" ("The Print") episode of their television series "Simon and Simon" is not substantially similar to Nash's Dillinger Story.

*Background*

Before we consider the similarity, if any, between The Print and Nash's books, a brief review of copyright doctrine may be helpful. The parties devote much of their briefs to doctrinal arguments, and a review of the law should clear up these arguments. Moreover, a review should clarify where our decision fits within the overall framework of copyright law.

■ As we noted, in order to prove copyright infringement, a plaintiff must prove (1) ownership of a valid copyright and (2) copying. *Atari v. North American*, 672 F.2d 607, 614 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). Because direct evidence of copying is rare, the plaintiff normally proves this element by circumstantial evidence. *Id.* Under Seventh Circuit case law, there appear to be at least two recognized methods to prove copying circumstantially. Under the first method, the plaintiff proves (1) that the defendant had "access" to the copyrighted material and (2) that the accused material is "substantially similar" to plaintiff's copyrighted expression. *Id.* The second method is a variation on the first. If the plaintiff shows that his material is "strikingly similar" to the defendant's, then he has a reduced burden in proving "access." *See Selle v. Gibb*, 741 F.2d 896 (7th Cir.1984).

■ How much the second method reduces the plaintiff's burden in showing access is unclear under current case law. However, it is certain that the plaintiff must produce some evidence from which a reasonable inference of "access" can be drawn, no matter how "strikingly similar"

---

1. The necessary attributes of ownership are: "(1) originality in the author, (2) copyrightability of subject matter, (3) citizenship status of the author such as to permit a claim of copyright, (4) compliance with applicable statutory formalities, and (5) [if plaintiff is not the author] a transfer of rights...." Nimmer, *Nimmer on Copyright*, § 13.01[4].

the works are. *Id.* at 901. In the words of the Seventh Circuit, a plaintiff must show more than a "bare possibility," "conjecture" or "speculation" of "access." *Id.* at 902–903. Conversely, the Seventh Circuit has suggested that where evidence of access is strong, the plaintiff's burden in showing "striking similarity" may be reduced. *See Id.* at n. 4. Fortunately, this case does not require us to parse the distinctions between these relative burdens of proof. *See* Nimmer, *Nimmer on Copyright*, § 13.02[3] (criticizing the Seventh Circuit's reasoning in *Selle* ). The Seventh Circuit and all commentators agree that, even if a plaintiff utilizes this second method of circumstantial proof, he must show that his copyrighted expression is "substantially similar" to the defendant's accused work. *Id.* at 900–901; Nimmer, *Nimmer on Copyright*, § 13.02[B], § 13.03[A]. Therefore, if Nash cannot show, as the defendants contend, that The Print is "substantially similar" to the Dillinger Story, he cannot prove "copying" by means of either recognized method of circumstantial proof.

The standard for determining "substantial similarity," is somewhat nebulous. The Seventh Circuit has framed the inquiry as a two-part test: "(1) whether the defendant copied from the plaintiff's work and (2) whether the copying, if proven, went so far as to constitute an improper appropriation." *Atari*, 672 F.2d at 614. At first blush, it appears that the first prong of this test is simply a restatement of the second element of a copyright cause of action, i.e., "copying." Indeed, the Seventh Circuit has not clearly described the nature of the first prong inquiry. *See e.g., Scott v. WKJG*, 376 F.2d 467 (7th Cir.), *cert. denied*, 389 U.S. 832, 88 S.Ct. 101, 19 L.Ed.2d 91 (1967). Other circuits have suggested alternative formulations for this inquiry. *See Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir.1946) (holding that dissection and expert testimony is proper) and *Sid and Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1164 (calling for "extrinsic-intrinsic test"). Fortunately, we can again dodge the bullet on a tough question of copyright law. As the defendant has agreed to assume "copying" (as that term is used in the first prong of the "substantial similarity" test), Defendants' Memorandum Supporting Motion for Summary Judgment on Issue of Substantial Similarity at 3, we need not address this issue.

Therefore, our focus on this motion is the second prong of the "substantial similarity" test, i.e. "unlawful appropriation." Courts have developed a "test" for assessing unlawful appropriation. The Seventh Circuit refers to it as the "lay observer test" and defines the inquiry as "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Atari*, 672 F.2d at 614.

Nash argues that, in making this determination, the trier of fact should compare the "total concept and feel" of his books with that of The Print. He would thus have us consider similarities between his books in their entirety, including their unprotected portions, and The Print. We disagree. The Seventh Circuit has clearly stated that "the ordinary observer test, in application, must take into account that the copyright laws preclude appropriation of only those elements of the work that are protected by the copyright." *Id.* Thus, Nash cannot show unlawful appropriation on the basis that his books and The Print share unprotected expression, e.g., "ideas" and "facts." As we have already held that the only relevant copyrightable material in Nash's books is his Dillinger Story, we look only to whether a reasonable trier of fact could find that The Print "unlawfully appropriated" Nash's Dillinger Story.

We need to discuss only one more legal issue before turning to our comparison of The Print and The Dillinger Story. Because "unlawful appropriation" can be such an elusive concept, courts have suggested numerous approaches by which to compare a copyrighted work and allegedly infringing material. With respect to literary works, the Seventh Circuit has approved the "abstractions test" and its "refinement," the so-called "pattern test."

*Atari,* 672 F.2d at n. 8. Judge Learned Hand described the abstractions test as follows:

"Upon any work ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out.... *[T]here is a point in this series of abstractions where they are no longer protected,* since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended. Nobody has ever been able to fix that boundary, and nobody ever can.... As respects plays, the controversy chiefly centers upon the characters and sequence of incident, these being the substance."

*Atari,* 672 F.2d at 615–16, *quoting Nichols v. Universal Pictures,* 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931) (emphasis added).

Building on Judge Hand's analysis, Professor Chafee articulated his pattern test: "No doubt the line does lie somewhere between the author's idea and the precise form in which he wrote it down.... [P]rotection covers the "pattern" of the work ... the sequence of events, and the development of the interplay of characters." *Atari,* 672 F.2d at n. 8, *quoting* Chafee, *Reflections on the Law of Copyright,* 45 Colum.L.Rev. 503, 513 (1945).[2]

In sum, on this motion we must examine whether a reasonable trier of fact could find that The Print unlawfully appropriated The Dillinger Story. To do so, we will compare the works at issue by using the abstractions and pattern tests approved by the Seventh Circuit. We now turn to the works at issue.

## THE WORKS AT ISSUE

### 1. *Nash's Books*

Nash contends that his Dillinger Story appears in four of his books: *Dillinger: Dead or Alive?* ("*DDOA*"), *The Dillinger Dossier* ("*TDD*"), *Citizen Hoover* ("*CH*"), and *Bloodletters and Badmen* ("*BAB*"). Indeed, each book contains passages asserting that Dillinger did not die outside the Biograph Theater in 1934.

In *BAB,* Nash's encyclopedia of famous criminals, the short biographical section on Dillinger contains an outline of Nash's theory that Dillinger did not die in 1934. *CH* also gives a brief description of Nash's contention that the FBI killed the wrong man outside the Biograph Theater. Further, it includes Nash's belief that J. Edgar Hoover participated in a cover-up of the mistaken shooting. By contrast, *TDD* and *DDOA* [3] are 200–plus page accounts of how Nash's investigative reporting uncovered the "truth" about Dillinger. The books contain exhaustive expositions of Nash's theory regarding Dillinger. In both books, Nash switches back and forth between several formats: first-person narration of his reporting, biographical discussions of Dillinger and his compatriots, and accounts of interviews Nash conducted with certain figures in Dillinger's life.

Despite differences in format and style, all four books make the same argument: that Dillinger was not shot outside the Biograph Theater on July 22, 1934. According to Nash, on that night in 1934, the

---

**2.** We note that the abstraction and pattern tests can produce paradoxical results when the material at issue is a work of historical nonfiction. As one moves down the levels of "abstractions," under Judge Hand's analysis, or closer to the author's "precise form," under Professor Chafee's theory, one would expect increasingly greater copyright protection. However, describing a piece of historical nonfiction with ever greater specificity and particularity brings one closer to simply relating the facts of the subject matter of the piece, e.g., the actual events in the life of the subject of a biography. Of course, these facts are not copyrightable. Therefore, where the protected expression is an explanation or interpretation of facts, such as the Dillinger Story,

the plaintiff cannot rely upon the lowest level of abstraction to show "substantial similarity," as he would with a work of fiction. He must make his "substantial similarity" showing at a somewhat higher level of abstraction. In spite of this paradox and of Nash's conclusory argument that the abstractions and pattern tests are somehow "inappropriate" here, they seem to be the approved analytical methods which best "fit" the facts of this case.

**3.** *DDOA* and *TDD* are not really two different books. *TDD* is a reprint of *DDOA* that includes new material allegedly explaining what happened to Dillinger after 1934.

FBI killed Jimmy Lawrence, a small-time hoodlum who was posing as Dillinger. After 1934, Nash believes that Dillinger moved to the West Coast, where he remained until at least 1979. In support of his theory, Nash points to numerous discrepancies between the physical characteristics of Dillinger and the corpse described in the 1934 autopsy, the FBI's alleged "planting" of Dillinger's fingerprints in the Cook County morgue, the supposedly unreliable identification of the corpse made by Dillinger's sister, the decision of Dillinger's father to encase the coffin in cement, and many other facts. Nash also recounts numerous interviews which purportedly support his theory.

In our earlier opinion, we held that the only relevant copyrightable material in Nash's books is what we called his Dillinger Story. In other words, we found that the way in which Nash employs certain facts and evidence to create his own story about Dillinger is copyrightable. However, as our earlier opinion emphasized, this protection is limited: "Our holding is very narrow. We hold only that Nash's interpretative Dillinger Story is copyrightable. Neither the idea that Dillinger did not die in 1934 nor the historical facts cited by Nash in support of the Dillinger Story are protected." *See Jay Robert Nash v. CBS, Inc., et al.,* 691 F.Supp. at 143. Thus, we must look to whether The Print appropriated The Dillinger Story, the copyrightable element of Nash's works.

### 2. The Dillinger Print

The Print is an episode of "Simon and Simon," a weekly television series featuring two brothers, Rick and A.J. Simon, who work together as private detectives in San Diego. The opening scene of The Print shows Ty Becker, a retired FBI agent, telling his grandchildren about Dillinger's life and the shooting outside the Biograph Theater on July 22, 1934. Ty also mentions that he doubts Dillinger was the man who was shot that night and vows to track him down some day. After the grandchildren leave with his daughter Addie, an intruder breaks into Ty's home, steals an old gun which once belonged to Dillinger, and kills Ty with the gun.

Concerned that the police would regard Ty's death as a typical murder incident to burglary rather than related to moonlighting she suspected he was performing for the FBI, Addie hires the Simons. Next, Addie goes to the bank to remove her father's safety deposit box. While she is in the vault, a masked man, wearing 1930s–style spectator shoes, shoots tear gas into the bank and steals Ty's safety deposit box. The Simons arrive at the bank soon thereafter and pick up the thief's gun, which turns out to be the Dillinger gun stolen from Ty's house. Police investigation later reveals that the gun bears the fresh fingerprint of John Dillinger.

The Simons are next seen purchasing newspapers which are carrying the story that Dillinger may be alive. As the Simons discuss the case, A.J. reads from a book entitled "Twentieth Century Desperadoes." He implies that some evidence supports the idea Dillinger is alive and relates to Rick several physical discrepancies between Dillinger and the corpse described in the 1934 autopsy. Nash cites the same discrepancies in his books.

Numerous Dillinger impostors soon come forward, and the FBI enters the case. However, FBI Agent Kinneman, who is a friend of A.J.'s, informs the Simons that Ty Becker was not working for the FBI at the time of his death.

The scene then switches to a health club. As A.J. and Kinneman are playing racquetball, a man wearing a trench coat and spectator shoes enters the club and, from the viewing area, sprays a salvo of bullets over A.J. and Kinneman. Afterwards, A.J. solemnly swears revenge against Dillinger or whoever tried to shoot him.

The next day, the Simons visit the police station and discover that "leads" regarding Dillinger's whereabouts have poured in from all over the world. They agree to check out a few leads, including one that takes them to a dentist in San Diego. The dentist rejects the Simons' suggestion that Dillinger lives in his house and attributes

the police tip to a crazy woman who lives across the street.

The Simons and Addie then pay a visit to Ty Becker's old secretary, who informs them that Ty was working on an internal FBI investigation at the time he was killed. Immediately thereafter, the Simons and Addie receive a call from Kinneman, who tells them that "there is more truth to this" Dillinger affair than anyone had imagined and that the Simons should meet him at a closed-down theater.

When the Simons and Addie enter the theater, a gangster documentary is playing. Kinneman and a man wearing spectator shoes shoot at the trio. The Simons eventually kill the man in spectator shoes. They then subdue Kinneman, who admits to killing Ty Becker in order to stop the internal investigation which, it turns out, was directed at Kinneman, and to leaving the fake Dillinger fingerprint on the gun at the bank.

In the penultimate scene, the FBI thanks the Simons for their help in arresting Kinneman and solving the Dillinger mystery. Rick nevertheless insists Dillinger may be alive and perhaps living in Oregon, as Nash contends in *DDOA*. The episode closes with a teaser: the dentist, one of the leads whom the Simons had interviewed earlier in the program, is seen pushing his elderly father in a wheelchair and admonishing him to refrain from discussing the "old days in Chicago" anymore.

### 3. *Comparison*

■ At the outset, we note that an eyeball comparison of Nash's Dillinger Story and The Print shows that they are similar in only the slightest way. The plot, characters, tone, time period and mood of the works have almost nothing in common. In our view, the only arguable similarities between The Print and Nash's books are (1) A.J.'s relating to Rick some of the same physical discrepancies between Dillinger

and the autopsy report that Nash cites in his books, and (2) Rick's suggestion that Dillinger moved to Oregon. However, these slight similarities are hardly "substantial" enough to support an infringement claim. Thus, in our eyeball comparison between the books and The Print, it is difficult to see any similarities which a trier of fact could regard as "substantial."

Applying the Seventh Circuit's preferred approaches for comparing copyrighted and allegedly infringing materials, we reach the same conclusion. Under Judge Hand's abstraction test, we look to the level of abstraction shared by Nash's works and The Print. Other than the premise that Dillinger did not die in 1934 and that some evidence supports this belief, The Print and the books are completely dissimilar.[4] In our view, this level of similarity is far too "high" on the abstraction "scale" to constitute "substantial similarity." This level of similarity is only slightly more particular than the idea that Dillinger did not die in 1934, which we have already held is uncopyrightable. Although it is often difficult to point to the level of abstraction at which similarities become actionable under copyright law, this is not a close case. We hold that the shared premise that Dillinger did not die and that evidence supports this belief is a very high level of abstraction and that Nash cannot show unlawful appropriation on this basis.

Professor Chafee's pattern test yields the same result. Neither the "sequence of events" nor "the interplay and development of the characters" of the works at issue are vaguely similar, much less "substantially similar".[5]

Nash, of course, disagrees with our assessment that there are no actionable similarities in these works. In his memorandum, he cites seven "major similarities" between his books and The Print. We

---

**4.** Nash contends that the number of dissimilarities are irrelevant, if the similarities are substantial. This may be true, but our point is that the similarities are not substantial.

**5.** As we find no similarity under the abstractions and pattern approaches, we need not address the *scenes a faire* doctrine. We note only that, because there are so few similarities between the works, it is difficult to see how the works shared stock devices or characters.

quote Nash's description of each major similarity and discuss each in turn:

| Nash's Books | The Print |
| --- | --- |
| 1. The FBI realized after the shooting that they had killed the wrong man and had to cover up their error to the public. | 1. The FBI realized after the shooting that they had killed the wrong man and had to cover up their error to the public. |

Nash's contention is simply wrong. The Print does not touch upon whether the FBI covered up the fact its agents had mistakenly killed Jimmy Lawrence, or any other person.

| Nash's Books | The Print |
| --- | --- |
| 2. Dillinger's fingerprints were "planted" in the Cook County Morgue to deceive authorities, the public and the press as to the identity of the person killed. | 2. Dillinger's fingerprints were planted by a killer at the scene of the murder of an FBI agent to throw off investigators and to deceive the public and the press. |

Nash's works include an alleged "planting" of fingerprint records, rather than an actual fingerprint, as occurred in The Print. Moreover, the planting which took place in Nash's works occurred in the 1930s while all the action in The Print was set in the 1980s.

| Nash's Books | The Print |
| --- | --- |
| 3. Dillinger was falsely blamed for the robbery of the First National Bank of East Chicago, Indiana and the killing of a policeman (Patrick O'Mally) in 1934. | 3. Dillinger is falsely blamed for a murder and bank robbery he had nothing to do with. |

This is not a similarity; the murders and robberies took place decades apart and involved completely different circumstances and motives.

| Nash's Books | The Print |
| --- | --- |
| 4. Certain photographs were creatively selected to be included in Nash's Works to help support his Dillinger theory. | 4. Four key photographs from Nash's Works appear including (in altered form) the one that follows page 76 of Dillinger: Dead or Alive?, which was attached to the original Story Outline submitted by Defendants Butler and Clarke to Universal. Another Stop–Action shot from an old newsreel appears, showing the exact frame Nash chose in his Works to demonstrate the absence of one of Dillinger's teeth. The only photographs in the Episode are ones included in Nash's Works. |

In our earlier opinion, we held that the "selection and compilation" of photographs contained in Nash's books may be copyrightable. At 827, n. 3. However, even assuming the defendants utilized four of the photographs which appear in Nash's books, the simple use of the photographs does not appropriate Nash's "selection and compilation." In The Print, the photographs did not appear together or in the same order as they did in Nash's works. Further, the defendants did not use the photographs for the same purpose Nash did, i.e., to support the theory that Dillinger did not die. In sum, while the defendants may have used the same photographs Nash did, this similarity does not infringe upon Nash's copyrightable interest in the pictures, i.e. their selection and arrangement.

| Nash's Books | The Print |
| --- | --- |
| 5. Certain incidents, events and possible occurrences were selected or created by Nash to make his Works more interesting and entertaining, including: | 5. These incidents, events and possible occurrences appear: |
| a. persons, including two from the Los Angeles area, coming forward claiming to be Dillinger; | a. two imposters from Southern California coming forward claiming to be Dillinger; |
| b. the characterization of these persons as "crackpots"; | b. characterizations of these imposters as "lunatics" and "Whackos"; |
| c. a large number of leads as to Dillinger's whereabouts from people across the country with a good portion of the leads coming from California; | c. the statement by the police that lots of leads have come in from California and other parts of the country; |
| d. a lead from one person claiming that Dillinger is a nearby neighbor; | d. a lead from a woman claiming that Dillinger was living with one of her neighbors....; |
| e. the suggested possibility that Dillinger may still be alive; | e. the suggestion that the dentist's father is Dillinger (and hence alive); |
| f. a strong possibility that Dillinger ended up living in Oregon after he escaped from Chicago. | f. the statement by Rick that Dillinger died of old age in Oregon. |

As far as No. 5a-d are concerned, the fact that leads came in from all over the world and that wacky Dillinger impostors came forward are very general similarities. None of the specific leads or impostors were the same. The similarity rests only on the most abstract level: that Dillinger impostors exist and that far-reaching leads regarding Dillinger's whereabouts would result from a publicized investigation of Dillinger. With respect to No. 5e, we have

already held that Nash cannot rely upon the idea that Dillinger did not die in order to show substantial similarity. With regard to No. 5f, we agree that this is a similarity. However, Rick's statement is almost a throwaway line which has little bearing upon the story. In itself, this cannot constitute substantial similarity.

| Nash's Books | The Print |
| --- | --- |
| 6. There was a possible relationship between Dillinger and organized crime, which was behind the faking of Dillinger's death. | 6. Near the end, an FBI man states that Kinneman is selling names and addresses of relocated witnesses "to the underworld." |

With respect to No. 6, it is difficult to understand Nash's point. In essence, Nash is arguing that, because The Print contains a character with underworld ties, it is similar to his books which suggest that Dillinger may have been connected with organized crime. Under Nash's theory, *The Godfather* would also be similar to his works. The fact that organized crime is referred to in defendants' television program is not actionable similarity.

| Nash's Books | The Print |
| --- | --- |
| 7. Bloodletters and Badmen states that a lost autopsy report disproves the victim's corpse as being Dillinger's due to the victim's eye color, height, weight, heart condition and scars. | 7. A.J. Simon reads a passage from the fictitious book Twentieth Century Desperadoes (which is almost identical in design, graphics, size and thickness to Bloodletters and Badmen) which refers to the physical discrepancies; there is a later reference to the victim's eye color as a physical discrepancy. |

As we noted above, the defendants do rely upon some of the same physical discrepancies between Dillinger and the autopsy report that Nash does. However, we have already held that no reasonable trier of fact could find substantial similarity on this basis.

To summarize, after reviewing Nash's books and The Print, we have concluded that the similarities between Nash's Dillinger Story and The Print are so slight that no reasonable trier of fact could conclude that they are "substantially similar." Because no genuine question of fact exists as to the material issue of "substantial similarity," we grant summary judgment in favor of the defendants on Count I.[6]

## COUNTS II AND III: UNFAIR COMPETITION AND UNFAIR TRADE PRACTICES

Counts II and III of Nash's complaint state claims for "unfair competition" and "unfair trade practices," respectively. In their motion to dismiss or, in the alternative, for judgment on the pleadings, the defendants argue that both counts are preempted by § 301 of the Copyright Act, 17 U.S.C. § 301.

■ Before discussing preemption, we note Nash argues that Count II includes a federal claim under the Lanham Act, 15 U.S.C. § 1125. To the extent that Count II raises a Lanham Act claim (we intimate no opinion as to the sufficiency of Nash's allegations),[7] we hold that it is not preempted by § 301.

Section 301[8] sets forth

... two conditions that both must be satisfied for preemption of a right under

---

6. Granting summary judgment on Count I does not destroy our subject matter jurisdiction. There appears to be complete diversity between the parties. *See* Complaint at ¶¶ 4–14; MCA Defendants Answer at ¶¶ 4–14; Defendants' 12(e) statement at 3, n. 2; Answer of Whitehead at ¶ 8; Answer of Butler at ¶ 9; Answer of Clarke at ¶ 10; Answer of Dial at ¶ 11; Answer of Chapman at ¶ 12; Answer of Geiger at ¶ 13; Answer of Piller at ¶ 14.

7. In their reply, the defendants challenge the sufficiency of Nash's federal claim. However, we cannot dismiss Nash's Lanham Act claim without hearing from him. Though his ability to state such a claim seems unlikely because he does not allege that The Print is his product or that it contains any false designation of origin, we must assume he can do so for the purposes of this motion.

8. Section 301 provides:

   **Preemption with respect to other laws**
   (a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date, whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law statutes of any State.

state law: First, the work in which the right is asserted must be fixed in tangible form and come within the subject matter of copyright as specified in § 102. Second, the right must be equivalent to any of the rights specified in § 106.

*Baltimore Orioles v. Major League Baseball Players,* 805 F.2d 663, 674 (7th Cir. 1986), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987).

■ With respect to the first condition, Nash's books clearly meet the requirement that the "work ... be fixed in a tangible form." *Id.* Furthermore, as "literary works," 17 U.S.C. § 102(a)(1), Nash's books come within the "subject matter of copyright." Nash misses the point when he argues that, because Counts II and III seek, in part, recovery for the appropriation of facts, ideas, research, and other uncopyrightable material, they escape preemption. The critical point is that Nash's books are materials within the subject matter of copyright. State law claims do not avoid preemption simply because they are based upon the improper use of uncopyrightable material contained in works properly subject to copyright. *See Baltimore Orioles,* 805 F.2d at 676; *Rand McNally v. Fleet Management Systems,* 591 F.Supp. 726 (N.D.Ill.1983) (Getzendanner, J.); Nimmer, *Nimmer on Copyright,* § 1.01[B]. If the rule were otherwise, states would be free to regulate materials Congress has assigned to the public domain. *Baltimore Orioles,* 805 F.2d at n. 23. Therefore, Counts II and III satisfy the first condition of the *Baltimore Orioles* test.

The second condition of the *Baltimore Orioles* test is met if the state law right is "equivalent" to one of the rights granted by the Copyright Act. A state law right is "equivalent" if: "(1) it is infringed by the mere act of reproduction, performance, distribution, or display, or (2) it requires additional elements to make out a cause of action, but the additional elements do not *differ in kind* from those necessary for copyright infringement." *Baltimore Orioles,* 805 F.2d 678 n. 26 (7th Cir.1986) (emphasis added). Nash asserts that Counts II and III are not preempted because they contain elements "additional to" and "different in kind from" his copyright cause of action. We examine each count in turn.

First, from the text of the complaint, it is difficult to determine under what theory Nash seeks recovery in Count II. He vaguely titles Count II "unfair competition" and includes no statutory citations. However, in his memoranda, he styles Count II as an action under the Uniform Deceptive Trade Practices Act ("UDTPA"), Ill.Rev.Stat. § 121½, ¶ 311 *et seq.*[9]

The UDTPA prohibits a wide variety of deceptive commercial practices and requires the person seeking recovery to show that the proscribed conduct resulted in "likelihood of confusion." *Id.* at ¶ 312. By contrast, confusion is not an essential element of an infringement action under the Copyright Act; the copying of protected expression, without more, constitutes infringement. *Atari,* 672 F.2d at 614. Thus, Nash's UDTPA claim does contain an "element" not present in his copyright action.

However, the existence of an "extra" element is not enough. We must determine whether the "confusion" element is different "in kind," or "qualitatively different" from the elements of copyright infringement. In discussing what is meant

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—
(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or
(2) any cause of action arising from undertakings commenced before January 1, 1978; or

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

9. As the UDTPA apparently applies only to "goods and services," it is difficult to see how Nash could state a claim under this statute. As the parties have addressed only the preemption issue on this motion, we assume that Nash can state a claim. *See* note 4, *supra.*

by "different in kind," the Seventh Circuit has approvingly cited cases which held that the elements of "scienter," "intent," and "commercial immorality" required for state law actions for wrongful appropriation are not sufficiently "different in kind" to preclude preemption. *Baltimore Orioles*, 805 F.2d at n. 26.

For example, in *Mayer v. Josiah Wedgwood*, 601 F.Supp. 1523 (S.D.N.Y.1985), the court held that the extra element of "commercial immorality" in the plaintiff's state law misappropriation claim was not sufficiently "qualitatively" different to preclude preemption. As the court viewed it, "commercial immorality" is:

> ... an extra element in the same sense that awareness and intent are: it alters the *scope* of the action but not its nature. That is, it would permit the action to go forward when the infringing conduct is immoral. The basic act which constitutes the infringement of plaintiff's rights, however, is the same as that of copyright.

*Id.* at 1535.

Therefore, under the *Mayer* court's view, "consumer confusion" would not be a "qualitatively different" element because it limits only the scope, not the nature, of Nash's claim. That is, the UDTPA would prohibit only those copyright infringements which cause confusion in the marketplace.

■ Although it cited *Mayer*, the court in *Baltimore Orioles* seemed to utilize a somewhat different analysis when addressing the precise issue before it: whether a state law publicity claim was preempted. In its discussion, the court emphasized that "the right of publicity is closely analogous to the goals of patent and copyright law." *Baltimore Orioles*, 805 F.2d at 679. Furthermore, in distinguishing between the right of publicity and the right of privacy, which is not preempted, the court noted:

It is true that the rights of publicity and of privacy evolved from similar origins; however, whereas the right of privacy protects against intrusions on seclusion, public disclosure of private facts, and casting an individual in a false light in the public eye, the right of publicity protects against the unauthorized exploitation of names, likenesses, personalities, and performances that have acquired value for the very reason that they are known to the public.

*Baltimore Orioles*, 805 F.2d at 678, n. 26 (7th Cir.1986). Thus, under *Baltimore Orioles*, it seems that we should compare the goal of the state law with the purpose of the Copyright Act.

Applying this "goal" analysis, we note that the UDTPA seeks both to prevent unfair competition between suppliers and to protect consumers in the marketplace. On the other hand, the central mission of the Copyright Act is to secure authors' intellectual property rights. It is true that the goals of these statutes are very similar in that they regulate unfair use of another's property. However, the UDTPA, unlike the Copyright Act, directly protects consumers, and we believe the goal of consumer protection renders the UDTPA sufficiently "different" from the Copyright Act. Therefore, under the "goal" analysis used in *Baltimore Orioles*, Nash would be able to pursue his UDTPA claim. Although we acknowledge that the case law is far from clear, we choose to follow the method of analysis actually employed in *Baltimore Orioles*, and hold that § 301 does not preempt Count II.[10]

■ Count III on its face is as unclear as Count II, and we must again look to Nash's memoranda for clarification. According to Nash, Count III states a claim for common law misappropriation. Nash correctly ex-

---

**10.** We acknowledge the defendants' argument that "reverse passing off" claims under the UDTPA are very similar to misappropriation actions, which we find preempted in the following section. However, on this motion the crit-

ical differences are that the UDTPA requires "confusion" as an additional element of the claim and that UDTPA serves the additional "goal" of consumer protection.

plains that the tort of misappropriation was first recognized in *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), and that the Supreme Court of Illinois subsequently adopted it. *Board of Trade v. Dow Jones*, 98 Ill.2d 109, 74 Ill.Dec. 582, 456 N.E.2d 84 (1983). The Supreme Court of Illinois has not defined the tort precisely, but it appears to permit the owner of intellectual property to state a claim for wrongful taking or appropriation of the property. *Id.* 74 Ill.Dec. at 586–87, 456 N.E.2d at 88–89.

However, we find no support in the case law for Nash's assertion that a person must show "likelihood of confusion, misrepresentation of source, or deception of the public" in order to bring a misappropriation claim. Plaintiff's Answering Memorandum at 7. The parties have cited no case which mentions the requirement of "confusion." As far as the elements of misrepresentation and deception, the seminal *International News* case stressed that a plaintiff need not show the "palming off" of goods in order to state a claim. *International News*, 248 U.S. at 241–42, 39 S.Ct. at 73. The Court also explicitly stated that evidence of misrepresentation only "accentuates" a misappropriation claim and is not the "essence" of such an action. *Id.* at 242, 39 S.Ct. at 73.

■ Case law does not clearly delineate when one's use of another's work becomes "misappropriation." The Supreme Court of Illinois suggests that the line is crossed when the policy of protecting individuals who expend labor and effort outweighs the "freedom to imitate and duplicate [that] is vital to our free market economy." *Board of Trade*, 74 Ill.Dec. at 587, 456 N.E.2d at 89. Although this distinction appears to be a restatement of the policy balance underlying the law of intellectual property, some courts have identified it as "commercial immorality" and regarded it as an additional element of the tort of misappropriation. *See Rand McNally*, 591 F.Supp. at 739. As we noted above, though, courts which have considered the issue do not regard "commercial immorality" as an element sufficiently "different" to prevent preemption. *See Rand McNally*, 591 F.Supp. at 126; *Mayer*, 601 F.Supp. at 1535. While those courts did use different analyses, we reach the same conclusion using the Seventh Circuit's methodology in *Baltimore Orioles*. The "goal" underlying copyright law is the same as that driving the tort of misappropriation: balancing the need to provide economic incentives for authorship against the preservation of the freedom to imitate. Given the identical goals of the tort of misappropriation and the Copyright Act, we would be inclined to hold that § 301 always preempts the tort of misappropriation.

We hesitate to go so far, though, because Congress clearly intended to preserve some form of the tort of misappropriation. The House Judiciary Committee Report on the 1976 Amendments to the Copyright Act states as follows:

"Misappropriation" is not necessarily synonymous with copyright infringement and thus a cause of action labeled as "misappropriation" is not preempted if it is in fact based neither on a right within the general scope of copyright as specified by section 106 [section 106 of this title] nor on a right equivalent thereto. For example, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting "hot" news, whether in the traditional mold of *International News Service v. Associated Press*, 248 U.S. 215 (1918) [39 S.Ct. 68, 63 L.Ed. 211], or in the newer form of data updates from scientific, business, or financial data bases. Likewise, a person having no trust or other relationship with the proprietor of a computerized data base should not be immunized from sanctions against electronically or cryptographically breaching the proprietor's security arrangements and accessing the proprietor's data. The unauthorized data access which should be remediable might also be achieved by the

intentional interception of data transmissions by wire, microwave or laser transmissions, or by the common unintentional means of "crossed" telephone lines occasioned by errors in switching.

The proprietor of data displayed on the cathode ray tube of a computer terminal should be afforded protection against unauthorized printouts by third parties (with or without improper access), even if the data are not copyrightable. For example, the data may not be copyrighted because they are not fixed in a tangible medium of expression....

H. Report No. 1476, *reprinted at* 17 U.S.C.A. § 301.

We do not believe the House report reflects Congress's intent to preserve all misappropriation actions. If all misappropriation claims escaped § 301 preemption, a plaintiff could always challenge the use of his copyrighted material under both federal copyright law and the state law tort of misappropriation. This, in turn, would emasculate § 301. Congress considered § 301 as "one of the bedrock provisions" of the 1976 amendments to the Copyright Act and enacted § 301 in order to "establish a single system of federal statutory copyright." *Id.* If we interpreted the House Report to preclude preemption of all misappropriation claims, we would assure that pendent claims could be asserted in almost all infringement actions. We do not believe that Congress intended this, and, therefore, we hold that all misappropriation claims, except those similar to the examples cited in the House Report, are preempted. Here, Count III does not involve the "systematic" appropriation of "hot news" or valuable stored information.

Nor does it allege a special relationship between the parties. Therefore, we hold that § 301 preempts Count III of Nash's complaint.[11]

## CONCLUSION

We grant the defendants' motion for summary judgment on Count I. We grant their motion to dismiss as to Count III, but deny it as to Count II. However, plaintiff should amend Count II to make clear what statutes or common law theories he claims under, and to set forth clearly the ultimate facts which he believes entitled him to recover. If he invokes more than one statute or common law theory, he should set forth his claims in separate counts. The amendment should be filed by January 31, 1989.

11. Nash cites *Rand McNally,* 591 F.Supp. 726 (N.D.Ill.1983), *supra* at 832, for the proposition that his misappropriation claim is not preempted. It is true that the *Rand McNally* court held, without addressing First Amendment issues, that an action for use of factual data is outside the "subject matter of copyright" and therefore not preempted. We cannot determine from Nash's memoranda and pleadings whether he is making this specific claim here, *i.e.,* that defendants used certain facts he uncovered regarding Dillinger and that he has some state law interest in those facts. *See* Complaint at ¶ 31 ("unlaw-fully appropriating for [defendants'] own commercial advantage the fruits of Plaintiff's original research, thus leading the public to believe that [The Print] was somehow approved and endorsed or participated in by Plaintiff"). If Nash intends to assert such a state law claim (we intimate no opinion as to whether he can do so), he should amend his complaint accordingly. Such a claim may not be preempted under § 301, but it could raise serious First Amendment issues which we will not consider without the benefit of the parties' views.