73 F.Supp.2d 1044 (1999)
FRED WEHRENBERG CIRCUIT OF THEATRES, INC., Plaintiff,
v.
MOVIEFONE, INC., Defendant.
No. 4:98CV01461 CDP.
United States District Court, E.D. Missouri, Eastern Division.
November 1, 1999.
*1045 Michael Kovac, Partner, Lionel L. Lucchesi, Partner, Jonathan P. Soifer, Ned W. Randle, Polster and Lieder, St. Louis, MO, for Fred Wehrenberg Circuit of Theatres, Inc., plaintiff.
John B. Greenberg, Charles Alan Seigel, Managing Partner, Stolar Partnership, St. Louis, MO, H. Peter Haveles, Jr., Cadwalader and Wickersham, New York City, for Moviefone, Inc., defendant.

MEMORANDUM AND ORDER
PERRY, District Judge.
This matter is before the Court on cross-motions for summary judgment on count I and defendant's motion for summary judgment on count II of plaintiff's amended complaint.
Plaintiff Fred Wehrenberg Circuit of Theatres, Inc., a Missouri corporation with its principal place of business in Missouri, owns and operates numerous movie theaters in the St. Louis area, as well as in other geographic areas not at issue in this case. Defendant Moviefone, Inc. is a Delaware corporation with its principal place of business in New York.
In count I of its two-count amended complaint, plaintiff alleges that defendant engaged in common law unfair competition through misappropriation. Plaintiff brings count II pursuant to the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), alleging false or misleading description of fact. For the reasons set forth below, the Court will *1046 grant defendant's motion for summary judgment on both counts of the amended complaint and deny plaintiff's cross-motion.

I. Factual Background

In order to exhibit movies in its theaters, plaintiff must generate and publicize movie show time schedules for each of its theaters which, according to plaintiff, takes much time and effort. Plaintiff maintains an automated phone system and ticketing system called CINE-TIX through which movie patrons may purchase movie tickets by credit card up to five days in advance. In addition, plaintiff also operates a web site which contains plaintiff's movie schedules and information about its movie theaters. Plaintiff contends that it receives revenue from a few companies in exchange for its movie schedule information. For purposes of this motion, the Court will assume this is true.
Defendant provides movie listings for approximately 20,000 movie screens belonging to numerous theater companies in at least thirty-four geographic markets, including the St. Louis market, through its automated phone system and its Internet web site. In nineteen of those markets, defendant also engages in teleticketing, which allows movie patrons to purchase tickets in advance by credit card on the phone or over the web site. Defendant does not, however, provide teleticketing services in the St. Louis market.
Defendant entered the St. Louis market in the summer of 1998. While some theaters in St. Louis provide their movie show time information to defendant directly via computer or fax, defendant collects other theaters' schedules, including plaintiff's schedules, independently, and then places the information on its phone and web systems. Plaintiff contends that defendant, through defendant's fault, frequently provides incorrect and inaccurate movie theater and show time information in regard to plaintiff's schedules on its phone system and web site. For purposes of this motion, the Court will assume that defendant has inaccurately provided plaintiff's movie schedules over its phone and web systems through no fault of plaintiff.
Defendant advertises its services in the St. Louis market by placing advertisements in various publications, such as the Riverfront Times. These advertisements make no reference to individual movie exhibitors or to any movie show times. Defendant also sells advertising space on both its automated phone system and its web site, which movie studios and other companies purchase in order to advertise their movies or other merchandise. In addition, defendant's phone number and web site address often appear in cooperative advertisements found in newspapers. Cooperative advertisements publicize a particular movie, and are paid for by the movie studio that produces the movie and different movie exhibitors. These ads also contain a list of movie exhibitors showing the particular movie, therefore the names of plaintiff's theaters are, at times, found in cooperative advertisements with defendant's contact information.

II. Discussion

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if there is no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining summary judgment, the facts and the inferences from those facts are viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At the summary judgment stage, courts do not weigh the evidence and decide the truth of the matter, but rather determine if there is a genuine issue for trial. Anderson, 477 U.S. at 249, 106 S.Ct. 2505. Rule 56(c) mandates the entry of summary judgment against a party, if after adequate time for *1047 discovery, that party fails to make a showing sufficient to establish the existence of an essential element of the case that the party will have the burden of proving at trial. Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548.

A. Common Law Unfair Competition
In count I of its amended complaint, plaintiff alleges that defendant engaged in common law unfair competition. Plaintiff further elaborates on its claim of unfair competition in its amended complaint by claiming that it spends a substantial amount of time generating and maintaining its show time information and monitoring its CINE-TIX system, that plaintiff's show time information is time sensitive and changes continuously, and that unauthorized use of plaintiff's information constitutes free-riding on its costly efforts. In addition, plaintiff contends that its CINE-TIX service is in direct competition with defendant's services and that defendant's alleged free-riding on plaintiff's efforts will likely damage plaintiff. Plaintiff bases its claim of unfair competition on International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), in which the United States Supreme Court recognized misappropriation as a form of unfair competition. The specific type of misappropriation identified in International News Service has become known as misappropriation of "hot news." In order to determine if misappropriation of "hot news" is a valid cause of action in Missouri, and if so, whether plaintiff has established the essential elements of this cause of action, an examination of the International News Service case and the resulting theory of misappropriation is required.
In International News Service, the plaintiff Associated Press ("AP") and the defendant International News Service ("INS"), were both in the news wire business in which they competed to gather news and then distribute it to each of their respective member newspapers who paid for the services. AP claimed that INS was misappropriating its property, in the form of the news, because INS would copy the news from AP bulletin boards and early editions of east coast newspapers containing AP stories and then sell the AP stories as INS stories, sometimes intact and sometimes after rewriting them. While the Court mentioned that the news has some aspects that lend themselves to copyright protection and other aspects that do not, the Court did not focus on whether the news was protectable as property under concepts of copyright. Rather, the Court concerned itself with the business of making the news known to the world, in which the parties directly competed, and with deciding what constituted unfair competition within that business. Importantly, the Court stated that in determining what conduct comprises unfair competition, courts must make particular reference to the type of business at issue. Id. at 235-236, 39 S.Ct. 68.
The Court explained that the gathering of the news entailed great expense in terms of skill, effort, and money, and that the exchange value to the gatherer was dependent on the freshness and novelty of the news it distributed (thus the term "hot news"). Therefore, because news was the material out of which both parties were seeking profit at the same time in the same field, the Court recognized the news as quasi-property for this purpose. The Court declared that the defendant "in appropriating [the news] and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown." Id. at 239-40, 39 S.Ct. 68. The Court noted that INS's actions constituted an "unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not ..." Id. at 240, 39 S.Ct. 68. Finally, if INS were allowed to misappropriate the news at its height of value, the Court maintained that *1048 it would make publication profitless or of so little profit that it would "in effect cut off the service by rendering the cost prohibitive in comparison with the return." Id. at 241, 39 S.Ct. 68. The Court therefore upheld the injunction prohibiting INS's actions.
The Court decided International News Service under federal common law before the Court's decision in Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The application of misappropriation as a form of federal common law ceased to exist with the Erie decision. National Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 851 (2d Cir.1997); Schuchart & Assocs., Prof'l Engineers, Inc. v. Solo Serve Corp., 540 F.Supp. 928, 942 n. 9 (W.D.Tex.1982). Many states, however, adopted the theory of misappropriation as a form of state common law unfair competition.
In Missouri, common law unfair competition encompassed several categories of legal claims, including palming or passing off, trademark violations, and misappropriation. In National Tel. Directory Co. v. Dawson Mfg. Co., 214 Mo.App. 683, 263 S.W. 483, 484 (1924), the Missouri Court of Appeals held that unfair competition comprised more than merely the traditional passing off to the public the goods or business of one person for that of another. The court cited International News Service for the proposition that the doctrine of unfair competition had been expanded to "encompass the schemes and inventions of the modern genius bent upon reaping where he has not sown." Id. In 1974, the Missouri Court of Appeals again recognized, with reference to International News Service, that misappropriation was a component of Missouri's doctrine of unfair competition. National Broad. Co., Inc. v. Nance, 506 S.W.2d 483, 484 (Mo.Ct.App. 1974). The concept of misappropriation in Missouri was broader in its application than the specific misappropriation of "hot news" found in International News Service. For instance, in Nance, the defendant's misappropriation did not involve "hot news" at all but involved tape piracy in which the defendant rerecorded musical performances from audio tapes sold in stores and then sold the rerecordings to retail stores. Nance, 506 S.W.2d at 484.
In 1976, Congress revised the copyright law in the United States. With the advent of the new federal copyright law, Congress specifically preempted state copyright law which was "equivalent to any of the exclusive rights within the general scope of copyright ... and come within the subject matter of copyright" as designated by federal law. 17 U.S.C. § 301 (effective January 1, 1978). Misappropriation, as applied in many states, often involved rights and property that came under the new federal copyright law. Thus, it became a question for the courts whether each state's misappropriation doctrine was preempted. In Hartman v. Hallmark Cards, Inc., 833 F.2d 117 (8th Cir.1987), the Eighth Circuit addressed the preemption of misappropriation in Missouri. The plaintiff sued under both the theory of federal copyright infringement and the Missouri common law of misappropriation. The court declared that the plaintiff's misappropriation claim was "basically a reformulation of [her] copyright claims and is thus preempted by federal law." Id. at 121. In reaching its conclusion, the court cited the Ninth and Second Circuits for support, of which the Second Circuit specifically held that the misappropriation branch of unfair competition in New York was preempted. Id. (citing Litchfield v. Spielberg, 736 F.2d 1352, 1358 (9th Cir. 1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985), and Warner Bros. Inc. v. American Broad. Cos., Inc., 720 F.2d 231, 247 (2d Cir.1983)). Thus, as set forth by the Eighth Circuit, the doctrine of misappropriation in Missouri is preempted to the extent it is equivalent to federal copyright law. Id.; see also Banker's Promotional Marketing Group, Inc. v. Orange, 926 F.2d 704, 705 (8th Cir.1991) (approving Minnesota district court's application of Hartman in determining that *1049 state law claim of misappropriation was preempted by federal copyright law).
Plaintiff in this case does not argue that its movie show times should be protected by federal copyright law. In addition, in its memorandum in support of its motion for summary judgment, plaintiff seems to concede that, for the most part, the misappropriation doctrine in Missouri is preempted. Plaintiff contends, however, that the specific type of misappropriation in International News Service, namely misappropriation of "hot news," survives preemption by federal copyright law. Plaintiff argues that its movie schedules come within this "hot news" exception and are thus property interests capable of protection against misappropriation.
There appears to be no Missouri or Eighth Circuit case law addressing the issue of whether misappropriation of "hot news" survives preemption by federal copyright law. While Missouri common law misappropriation was obviously broader in its application than just misappropriation of "hot news," and, as evidenced by the Eighth Circuit decision in Hartman, was apparently the equivalent of federal copyright law, misappropriation of "hot news" would most likely survive preemption in Missouri based on the legislative history of the federal copyright law and other jurisdictions' interpretations of the "hot news" exception.
Section 301 of federal copyright law preempts state copyright laws which are the equivalent to federal copyright laws. 17 U.S.C. § 301. As stated before, this would include state misappropriation claims which are the equivalent to the federal copyright statutes. In the House Report accompanying section 301, however, misappropriation was not preempted completely. The House Report stated:
"Misappropriation" is not necessarily synonymous with copyright infringement, and thus a cause of action labeled as "misappropriation" is not preempted if it is in fact based neither on a right within the general scope of copyright as specified by section 106 nor on a right equivalent thereto. For example, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting "hot" news, whether in the traditional mold of International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), or in the newer form of data updates from scientific, business, or financial data bases.
H.R.Rep. No. 94-1476, at 132 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5748. Thus, this legislative history demonstrates an intent to exclude misappropriation of "hot news" from the preemption of section 301.
The Second Circuit and the Northern District of Illinois have held that misappropriation of "hot news" does survive federal copyright preemption as a narrow exception. In doing so, these courts recognized the above passage from the House Report as evidence of an intent to exempt misappropriation of "hot news" from preemption. National Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 850 (2d Cir. 1997); Financial Info., Inc. v. Moody's Investors Serv., Inc., 808 F.2d 204, 209 (2d Cir.1986), cert. denied, 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987); Gannett Satellite Info. Network, Inc. v. Rock Valley Community Press, Inc., No. 93 C 20244, 1994 WL 606171, at *5 (N.D.Ill. Oct.24, 1994); GI Corp. v. U.S. Elecs. Components Corp., No. 93 C 43, 1994 WL 494698, at *7-*8 (N.D.Ill. Sept. 6, 1994); Nash v. CBS, Inc., 704 F.Supp. 823, 835 (N.D.Ill. 1989), aff'd, 899 F.2d 1537 (7th Cir.1990); see also Schuchart & Assocs., Prof'l Engineers, Inc. v. Solo Serve Corp., 540 F.Supp. 928, 943 (W.D.Tex.1982) (quoting the House Report excerpt stating "hot news" misappropriation survives preemption, but not expressly holding it survives preemption); Bruce P. Keller et al., Trademarks and Unfair Competition Issues, in Protecting Your Intellectual Property Assets *1050 1999, at 257, 347-50 (PLI Patents, Copyrights, Trademarks, and Literary Property Course Handbook Series No. G9-0084, 1999). Therefore, because the common law of misappropriation in Missouri was based on International News Service and the very narrow exception of misappropriation of "hot news" as promulgated in International News Service survives federal copyright preemption based on the House Report, the Court believes that Missouri would allow a cause of action based on misappropriation of "hot news."
In National Basketball Assoc. v. Motorola, Inc., the Second Circuit detailed the elements that it decided misappropriation of "hot news" entailed. These elements are (1) the plaintiff generates or collects information at some cost or expense; (2) the value of the information is highly time sensitive; (3) the defendant's use of the information constitutes free-riding on the plaintiff's costly efforts to generate or collect it; (4) the defendant is in direct competition with a product or service offered by the plaintiff; and (5) the ability of other parties to free-ride on the efforts of the plaintiff would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened. NBA, 105 F.3d at 845, 852.
The Court agrees with defendant that plaintiff here has failed to establish the last element of the "hot news" exception to preemption. Plaintiff is in the business of exhibiting movies. In order for plaintiff to conduct its business, it is necessary for it to generate movie show time schedules and publicize those schedules to the public. If plaintiff fails to do either of these things, it will no longer be able to participate in the business of exhibiting movies. The core of plaintiff's business and the source of the majority of its profits is not the publication of movie schedules, even though plaintiff contends it receives some revenue in exchange for its movie schedules. The core of plaintiff's business is exhibiting movies and the profit it makes from ticket and concession sales. If defendant continues to display plaintiff's movie show times on its web site or offers plaintiff's schedules to its listeners over its phone system, defendant's actions will not reduce plaintiff's incentive to generate movie schedules or publicize them to the point that the existence or quality would be threatened, even assuming defendant incorrectly recites the information. In the words of International News Service, the cost of producing the schedules and publicizing them must render the production and publication "profitless or so little profitable as in effect to cut off the service by rendering the cost prohibitive in comparison with the return." International News Service, 248 U.S. at 241, 39 S.Ct. 68. For a claim of misappropriation of "hot news" to succeed, defendant's actions must make plaintiff virtually cease to participate in the business in question. This is not the circumstance in this case. Despite defendant's actions, plaintiff will still generate movie schedules and publicize them through a variety of media, including its CINE-TIX system and web site, in order to draw people to come to its movie theaters, buy tickets, and purchase concessions. Plaintiff has not established that it would stop exhibiting movies and doing what is necessary to facilitate exhibiting movies if defendant continues its actions. Therefore, plaintiff has failed to establish element five, and the Court will enter summary judgment for the defendant on count I. It is unnecessary to evaluate the other four elements because plaintiff has failed to establish the last one, and thus, the Court makes no determination whether or not plaintiff actually satisfies elements one through four of the test.

B. False Advertising under the Lanham Act
In count II of its amended complaint, plaintiff alleges that defendant violated the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), by mistakenly or inaccurately publishing plaintiff's movie schedules. Plaintiff contends that these errors will be attributed to plaintiff and will thereby reflect poorly *1051 on plaintiff's goodwill and reputation. Further, plaintiff claims that defendant's misrepresentation of theater and movie show time information in commercial advertising or promotion misrepresents the nature, characteristics, or quality of plaintiff's services and commercial activities. Defendant moves for summary judgment on count II of the amended complaint on the ground that its alleged conduct does not constitute commercial advertising or promotion.
The Lanham Act prohibits those "engaged in commerce" against false advertising. United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir.1998). The relevant provisions of the Lanham Act state:
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which 
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1)(B). In order to establish a claim under the Lanham Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. United Indus. Corp., 140 F.3d at 1180.
A commercial advertisement must be at issue in order to establish a Lanham Act violation. Recently, the Eighth Circuit stated that commercial speech is a threshold requirement for Lanham Act liability. Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1120 (8th Cir.1999) (quoting the language of 15 U.S.C. § 1125(a)(1)(B) requiring a "commercial advertising or promotion"). The court quoted legislative history that stated the Lanham Act "specifically extends only to false and misleading speech that is encompassed within the `commercial speech' doctrine developed by the United States Supreme Court." Id. (quoting 134 Cong.Rec. 31, 851 (Oct. 19, 1988) (statement of Rep. Kastenmeier)). The court then pronounced that three factors govern whether speech is commercial: (1) whether the communication is an advertisement; (2) whether it refers to a specific product or service; and (3) whether the speaker has an economic motivation for the speech. Id. (citing Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66-67, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)). The court noted that the presence of all three factors demonstrates "strong support" for the conclusion that the speech is commercial. Id. (quoting Bolger, 463 U.S. at 67, 103 S.Ct. 2875). The court, in applying these three elements to the case before it, stated that the communication was an advertisement because it "proposed a commercial transaction." Id. (quoting Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 423, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)). According to the Eighth Circuit, "core" commercial speech "does no more than propose a commercial transaction." Id. (quoting Discovery Network, 507 U.S. at 423, 113 S.Ct. 1505). The Eighth Circuit stated that the communication at issue proposed a commercial transaction by urging the reader to buy defendant's product instead of plaintiff's. The ad specifically referred to both products satisfying prong *1052 two of the commercial speech elements, and was motivated by financial concerns meeting prong three. Id. at 1121, 113 S.Ct. 1505. The court also noted that communications must be disseminated sufficiently to the relevant purchasing public within the industry in question in order to be actionable under the Lanham Act. Id. (quoting Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1384 (5th Cir.1996)).
The question before this Court then is whether defendant's conduct constituted commercial speech which would satisfy the Lanham Act requirement that a violation be based on a commercial advertisement or promotion. Defendant does advertise its own services, in a classic sense, in that it places advertisements in publications, such as the Riverfront Times. In those advertisements, however, defendant never refers to plaintiff's organization, its theaters, or its specific show times. On its phone system and on its web site, defendant also provides opportunities for movie studios and other entities to advertise their products by purchasing ad time and space. In these ads, defendant is not advertising its services at all, but is providing a medium by which other companies and entities are advertising their products. Again, plaintiff's movie schedules are not mentioned in or the subject of those advertisements placed by others. Movie studios and producers also often place cooperative advertisements in newspapers and other publications in which the studios advertise their movies and list all theaters in an area which are showing their movies, and sometimes lists defendant's service in the ad as well. Defendant is not responsible for the content of the cooperative ads as they are not placed by defendant. These three types of advertisements discussed above cannot be the subject of plaintiff's claim because these ads either do not address plaintiff's services or if they do, defendant is not responsible for them. Plaintiff, at times, attempts to argue that these advertisements automatically make all communications by defendant commercial speech. This is not the case, however. Plaintiff must demonstrate that defendant's communications which involve or reference plaintiff are, in fact, commercial speech.
Plaintiff argues that when defendant lists plaintiff's movie schedules on its phone system or on its web site, defendant is engaging in commercial speech for the purposes of the Lanham Act. The Eighth Circuit stated that the presence of all three factors of commercial speech provides strong evidence that the speech is commercial. In the case before this Court, all three factors are not present. The first element of commercial speech requires that the communication be an advertisement. The Eighth Circuit further defined the term advertisement requiring that the communication propose a commercial transaction. In this case, defendant is not proposing a commercial transaction by listing plaintiff's movie schedules. Defendant does not sell tickets to plaintiff's theater or to any other St. Louis theaters. Even if defendant lists the information incorrectly, defendant is not by doing so attempting to persuade its audience to purchase movie tickets from defendant instead of from plaintiff, because defendant does not exhibit movies or sell movie tickets for another exhibitor in the St. Louis area.
Plaintiff states that it is in competition with defendant because both parties have automated phone services that compete directly in an attempt to get movie-going customers to use those services. The undisputed facts do not support this argument, however. Plaintiff maintains a phone information system in order to persuade people to come watch movies at plaintiff's theaters. Thus, plaintiff competes with other movie exhibitors and possibly other teleticketers in the St. Louis market for dollars being spent by those wishing to attend movies. By providing its information service, defendant gains revenue from those companies who wish to advertise their products on its service. Therefore, defendant competes with other media entities for dollars being spent by movie studios and other companies interested in advertising their products. Defendant *1053 does not sell tickets to any theaters in the St. Louis area and thus does not compete with plaintiff in plaintiff's business of exhibiting movies.[1] Accordingly, when defendant lists plaintiff's movie schedules it is not proposing a commercial transaction.
The Court believes that on the undisputed facts, plaintiff has failed to show that defendant is engaging in commercial advertising or promotion as required by the statute and Eighth Circuit in order to state a Lanham Act claim. Plaintiff's failure to establish this essential element makes it unnecessary for the Court to examine the other elements of a Lanham Act false advertising claim, and defendant is entitled to summary judgment.
Accordingly,
IT IS HEREBY ORDERED that defendant's motion for summary judgment on counts I and II of plaintiff's amended complaint [# 66-1] is granted and plaintiff's motion for summary judgment on count I [# 63-1] is denied.
IT IS FURTHER ORDERED that defendant's motion to strike plaintiff's affidavit of Douglas Whitford [# 61-1] is denied as moot.
NOTES
[1] While plaintiff concedes that defendant is not currently offering teleticketing services in St. Louis, it contends that "there can be no doubt that given the slightest opportunity, they [defendant] will make a strong attempt to enter the St. Louis market as a teleticketing service." The Court is aware that in Maritz, Inc. v. Cybergold, Inc., 947 F.Supp. 1328, 1335 (E.D.Mo.1996), the court stated that a Lanham Act claim was not necessarily premature if the defendant's business was not yet operational. The court stated "a Lanham Act claim could exist even before a defendant actually opens the business, so long as the acts of defendant are imminent and impending." Here defendant has not engaged in any conduct that demonstrates that teleticketing in the St. Louis market is imminent and impending. In fact, according to defendant's Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year ended December 11, 1998, defendant only teletickets in nineteen of its thirty-four markets, thus showing that defendant's entrance into a market does not necessarily mean that teleticketing in that same market is "imminent and impending."