**G.D. SEARLE & CO., Plaintiff,**

v.

**PHILIPS–MILLER & ASSOCIATES, INC., Defendant.**

No. 92 C 3377.

United States District Court, N.D. Illinois, E.D.

Oct. 15, 1993.

Jay A. Canel, Peter M. King, William H. Jones, Canel, Davis & King, Chicago, IL, for plaintiff.

Frederick H. Branding, Daniel Charles Murray, Johnson & Bell, Ltd., Chicago, IL, Charles D. Bock, Fox, Bennett & Turner, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

Plaintiff Searle filed this action seeking a declaratory judgment to the effect that it did not misappropriate a marketing scheme presented to it by Philips–Miller. Philips–Miller has counterclaimed, alleging that Searle refused to pay for the program Philips–Miller

presented to it, and instead gave the program to Searle's own advertising firm, who implemented it. This rather intricate matter is before us today upon Plaintiff–Counterdefendant G.D. Searle's Motion for Summary Judgment. For the reasons stated below, Searle's motion is denied.

## Undisputed Facts [1]

Searle, a Delaware corporation, is a manufacturer and distributor of prescription drugs with its principal place of business is in Skokie, Illinois. Philips–Miller, a New York corporation, is in the advertising, public relations, and consulting business and maintains its principal place of business in New York City.

In March 1990, Philips–Miller made a confidential presentation to Searle at its office in Skokie. The presentation, both in printed and oral form, described a program which involved daily phone calls to patients to remind them to take their Searle prescription drugs. The oral presentation was made on Philips–Miller's behalf by Dorothy Philips and Ella Shapiro. The parties dispute whether the program involved only a Searle hypertension drug called Calan SR, or several Searle brand drugs. While the printed presentation mentions several Searle drugs, (Def.'s Ex. 1), Philips–Miller's presenter, Dorothy Philips, has testified that her presentation focused entirely on Calan SR. (Def.'s Ex. 16 at ¶ 6.) [2]

Searle employees Greg Baird, Paul Laland and Laura Leber were present at Philips–Miller's presentation. Less than a month after the presentation, Searle told Philips–Miller that it was not interested in the proposal.

Williams Douglas McAdams, Inc. ("McAdams") is a New York advertising agency that began working for Searle in 1986 or 1987, and is the advertising agency of record for Searle. McAdams is retained by Searle at the rate of $22,500.00 per month to develop and present marketing programs to Searle.

Eugene Fine of McAdams presented [3] a "Patient in Compliance" program to Searle in August 1991. Searle employees present were Dr. Sheldon Gilgore, Searle's Chairman, President and CEO, Chuck Fry, Vice President of Public Affairs, and Greg Baird of Searle Public Affairs. The McAdams "Patient in Compliance" program was a proposal that Searle contact users of Calan SR to remind them to take their medication once a week during the first week after the prescription was written, four times during the second week, three times during the third week, and once during the fourth week. Searle avers that it implemented the McAdams proposal, and paid McAdams $50,250.00 for its initial development of the proposal and has paid additional sums to McAdams to implement the program.

Searle argues that no one at McAdams ever saw the Philips–Miller proposal, and several McAdams employees have testified that they never saw the Philips–Miller proposal until they were shown it at their depositions in this case. Philips–Miller, of course disagrees.

When Philips–Miller got wind of Searle's deal with McAdams, it was mortified. In April, 1992, Philips–Miller threatened to sue Searle over the alleged use of its proposal. Searle, however, launched a "preemptive strike" in May, 1992 by filing the instant case for declaratory relief. Philips–Miller filed counterclaims in June, 1992 seeking relief

---

1. The facts recited herein are gleaned from the parties' Local Rule 12 statements and exhibits. Unfortunately, the parties' shared penchant for misusing their Rule 12 statements for petty argumentation rather than a straightforward presentation of the facts has made this court's job in determining precisely what is undisputed all the more difficult.

2. The origination and development of the patient compliance program within Philips–Miller is also in dispute.

3. The petty way in which this litigation has been conducted is brought to light by Philips–Miller's denial here. Though it hardly bothers to address the contents of Fine's proposal, it denies that Fine "presented" the idea to Searle because of "the implication that a new idea was 'presented' by McAdams to Searle in the 8/91 meeting" because the idea was allegedly stolen from Philips–Miller, and thus not new. (Def.'s 12(n) ¶ 17.) This silliness is detrimental to efficient resolution of this litigation and frankly, unwelcome.

under the common law theories of misappropriation, quasi-contract and implied contract. Searle moved for summary judgment on two grounds: (1) nothing about Philips–Miller's proposal was novel or unique; and (2) McAdams independently developed its program.

Upon our initial review of this motion and the pertinent law, we became concerned that part or all of Philips–Miller's claims may be preempted by section 301 of the Copyright Act. 17 U.S.C. § 301. Neither party had raised the issue in the original briefing. In order to benefit from the wisdom of the parties, we ordered additional briefing by minute order on July 7 on the issue of whether Philips–Miller's claims, in sum or in part, are preempted by section 301.

Searle's 10–page Supplemental Memorandum argues that Philips–Miller's misappropriation claim is preempted by the Copyright Act, but that Philips–Miller's quasi and implied contract claims are not. Philips–Miller, in a 24–page brief, argues that none of its claims are preempted.

### Findings of Fact and Conclusions of Law

■ For defendants to prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). At this stage, we do not weigh evidence or determine the truth of asserted matters. We simply determine whether there is a genuine issue for trial, i.e. "whether a proper jury question was presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the nonmoving party bears "the burden of proof at trial on a dispositive issue, [however] ... the nonmoving party [is required] to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), quoting Fed.R.Civ.P. 56(e).

### I. Preemption Under Section 301 of the Copyright Act

Section 301 of the Copyright Act, intended to end the dual copyright protection system that existed in the United States since 1790, provides in relevant part:

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State. 17 U.S.C. § 301(a).

■ Section 301 preempts state law copyright and equivalent claims. Under the statute, there is a three-pronged preemption analysis. Philips–Miller's action is preempted if (1) the work is fixed in tangible form; (2) the work comes within the subject matter of copyright as specified by sections 102 and 103 of the Act; and (3) the legal or equitable rights which plaintiff seeks to enforce are the equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106. *Id.* See also *Baltimore Orioles v. Major League Baseball Players Ass'n,* 805 F.2d 663, 674 (7th Cir.1986), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987); *Weigel Broadcasting Co. v. Topel,* No. 83 C 7921, 1985 WL 2360, *2 (N.D.Ill. Aug. 21, 1985) (Marshall, J.).

■ Section 301(b) expressly provides that a state law cause of action is not preempted where the right protected by the state law is not the equivalent of an exclusive federal right and where it does not come within the subject matter of federal copyright laws, "including works of authorship not fixed in any tangible medium of expression." 17 U.S.C. § 301(b). However, most literary works are within the subject matter of copyright, even if the material cannot be copyrighted. *See Om v. Weathers,* No. 91 C 4005, 1992 WL

151553, *2 (N.D.Ill. June 23, 1992) (Moran, C.J.).

## A. *Section 102 of the Copyright Act*

Our first question must be whether the Philips–Miller proposal falls within the subject matter of Copyright as defined by section 102. Section 102 of the Act, entitled, "Subject Matter of Copyright: In General," provides some examples of "works of authorship" that are protected. 17 U.S.C. § 102(a). Under section 102, a work must meet three criteria. The work must be: (1) fixed in a tangible form; (2) an original work of authorship; and (3) it must come within the subject matter of copyright. *Baltimore Orioles*, 805 F.2d at 668.

■ Section 102(a), though broad in its scope, does not protect mere "ideas:" "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). Rather, copyright protects "an author's particular expression of an idea." *Om*, 1992 WL 151553 at *2 (citation omitted).

■ Certainly, there is no dispute from Philips–Miller that its work is an original work of authorship. To the contrary, their entire case rests upon that proposition.[4] Thus, we move on to the two remaining issues under section 102. Philips–Miller asserts that its proposal was a mere idea, and thus not fixed in a tangible medium or subject to copyright protection under section 102(b). We disagree on both points.

■ First, Philips–Miller's proposal was certainly fixed in a tangible medium. Under section 101, "[a] work is 'fixed' in a tangible medium of expression when its embodiment in a copy . . ., by or under the authority of the author, is sufficiently permanent and sta-

ble to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101. Philips–Miller's 30–page written proposal, (Def.'s Ex. 1), was certainly fixed in a tangible form.

Second, the written proposal presented to Searle in March, 1990, was more than just Philips–Miller's bare "idea" to call prescription drug users to remind them to take their medicine. To the contrary, Philips–Miller's proposal gave great detail about the rationale behind and implementation of that idea. The proposal was clearly "an author's particular expression of an idea." *Om*, 1992 WL 151553 at *2.

As Searle points out, a great deal of Philips–Miller's theory that McAdams copied their proposal rests upon point-by-point comparisons between their March 1990 proposal and McAdams August 1991 proposal. (Def.'s 12(m) ¶ 48.) Those comparisons involve much more than the simple "idea" of calling prescription drug patients. Rather, those comparisons go to the particular implementation of Philips–Millers idea, including slogans, titles, duration, scope, and various other aspects of implementation. The proposal was a particular embodiment of Philips–Miller's idea fixed in tangible form, and satisfies section 101's definition. (Def.'s Ex. 1.) *See, e.g., Eales v. Environmental Lifestyles*, 958 F.2d 876, 880 (9th Cir.) (architect's plans for home constituted protectable expression of an idea rather than unprotectable idea where plans laid out location and size of numerous features), *cert. denied sub nom, Shotey v. Eales*, —— U.S. ——, 113 S.Ct. 605, 121 L.Ed.2d 541 (1992).

## B. *Section 106 of the Copyright Act*

■ Because Philips–Miller's proposal was fixed in a tangible medium of expression and falls within the subject matter of copyright as defined by section 102, we move on to the

---

4. We do not determine here the issue of whether Philips–Miller's proposal was novel or unique. The question is not whether the proposal was unique enough to be copyrightable. To the contrary, if the proposal fits into one of the general subject matter categories of sections 102 or 103, state law claims are preempted whether or not it

could ultimately receive federal copyright protection. *McNabb Bennett & Associates v. Terp Meyers Architects*, No. 85 C 8792, 1987 WL 7817, *5 (N.D.Ill. March 10, 1987) (Williams, J.); *Rand McNally & Co. v. Fleet Management Systems*, 591 F.Supp. 726, 739 (N.D.Ill.1983).

final question in the preemption analysis, whether the rights Philips–Miller seeks to vindicate under state law are equivalent to exclusive federal rights. A state law right is equivalent to a right protected by the Copyright Act if (1) it is infringed by the mere act of reproduction, performance, distribution, or display; or (2) it requires additional elements to make out a cause of action, but the additional elements are not different in kind from those necessary for copyright infringement. *Baltimore Orioles,* 805 F.2d at 678 n. 26.

### 1. *Misappropriation*

The question of whether a claim for the tort of misappropriation is preempted by the copyright act has split the courts in this district. However, the weight of the authority favors preemption of misappropriation claims.

While several courts have held that claims for misappropriation are preempted, *see CEO Marketing Promotions v. Heartland Promotions,* 739 F.Supp. 1150, 1152 (N.D.Ill. 1990) (claim for misappropriation of advertising materials preempted); *Nash v. CBS,* 704 F.Supp. 823, 833–35 (N.D.Ill.1989) (state misappropriation claim for story about John Dillinger preempted by § 301), *aff'd,* 899 F.2d 1537 (7th Cir.1990); *Weigel Broadcasting Co. v. Topel,* No. 83 C 7921, 1985 WL 2360 (N.D.Ill. filed Aug. 21, 1985) (Marshall, J.) (misappropriation claim concerning engineering data preempted), other courts have noted that while copyright protects against wrongful reproduction or another's work, misappropriation focuses on whether the tortfeasor actually used, not copied, another's property, and is therefore not preempted. *See, e.g., McNabb Bennett & Associates v. Terp Meyers Architects,* No. 85 C 8792, 1987 WL 7817, *5 (N.D.Ill. March 10, 1987) (Williams, J.); *Rand McNally & Co. v. Fleet Management Systems,* 591 F.Supp. 726, 739 (N.D.Ill. 1983).[5]

The legislative history shows that most, but not all misappropriation claims are preempted by section 301. In *Nash,* Judge Grady held that all misappropriation claims except those specifically excluded by Congress are preempted by section 301. *Nash,* 704 F.Supp. at 835 (*citing* H.R. 1476, 94th Cong., 2d sess., *reprinted in,* 1976 U.S.C.C.A.N. 5659). Thus, unless a misappropriation claim involves " 'hot news' " or "valuable stored information," it is preempted under the *Nash* approach. *Id.* Under the *McNabb* and *Rand McNally* approach, however, a misappropriation claim is preempted where it seeks damage for copying but not where it seeks damages for the wrongful use of an idea.

In the present case, whether Philips–Miller's misappropriation claim seeks damages for wrongful copying or for wrongful use is not as simple as it might at first appear. Philips–Miller's counterclaim alleges that Searle "wrongfully adopted and used" Philips–Miller's proposal. (Def.'s Counterclaim ¶ 10.)

Though Philips–Miller argues in its Supplement Memorandum that its misappropriation claim seeks damages for improper use of its idea, the way Philips–Miller has gone about proving its case muddies the water on this issue substantially. Though Philips–Miller argues that the present case is distinct from *Nash* because *Nash* involved the copying of a literary work, Philips–Miller has used precisely the same methods to prove its case as the plaintiff did in *Nash:* side-by-side comparisons of portions of the text. *Cf.* Def.'s Local Rule 12(n) at ¶ 48, *with Nash,* 704 F.Supp. at 830. Philips–Miller's side-by-side comparison of numerous aspects of its March 1990 proposal with those of McAdam's August 1991 proposal certainly casts Philips–Miller's claim, at least in part, as one for improper copying.

In order to prevail in this case, Philips–Miller simply must prove that Searle reproduced and/or distributed Philips–Miller's 1990 proposal to McAdams. If Philips–Mil-

---

**5.** Philips–Miller cites *Warrington Associates. v. Real–Time Engineering Systems,* 522 F.Supp. 367 (N.D.Ill.1981) (Moran, J.) for the proposition that its misappropriation claim is not preempted. *Warrington* is inapposite, however, because it dealt with the tort of trade secret misappropriation. On the facts as plead in the present case, Philips–Miller cannot state a claim for trade secrets misappropriation because it voluntarily disclosed its proposal to Searle. *See Om v. Weathers,* No. 91 C 4005, 1992 WL 151553, *6 (N.D.Ill. June 23, 1992) (Moran, C.J.) (citations omitted).

ler cannot do so, it will not be able to prevail over Searle's independent development defense. Thus, the very heart of Philips–Miller's misappropriation claim is that Searle wrongfully distributed its proposal to Mc-Adams. As we noted above, a state right is equivalent to federal copyright protections if it is violated by, among other things, the mere "distribution" of the material. *Baltimore Orioles*, 805 F.2d at 677.

As we note above, determining whether's Philips–Miller's misappropriation claim is for "use" or for "copying" is not an easy task. However, whether it is characterized as improper "use" or improper "copying," the claim is the same as the one presented in *CEO*, and we believe that this claim is preempted:

> CEO's explanation for its employment of the misappropriation tort is to protect against Heartland's "misuse of the Advertising Materials" ... The alleged misuse was distribution of these advertising materials to Bankcard customers for enclosure to their cardholders. This is clearly equivalent to seeking copyright protection.

*CEO Marketing*, 739 F.Supp. at 1152.

Our decision is supported by a close reading of the legislative history of section 301. The House Report reveals that there was opposition to including unpublished advertising materials in the scope of section 301:

> Representatives of printers, while not opposed to the principle of section 301, expressed concern about its potential impact on protection of preliminary advertising copy and layouts prepared by printers. They argued that this material is frequently "pirated" by competitors, and that it would be a substantial burden if, in order to obtain full protection, the printer would have to make registrations and bear the

expense and bother of suing in Federal rather than State courts.

H.R. 1476, 94th Cong., 2d sess., at 131, *reprinted in,* 1976 U.S.C.C.A.N. 5659, 5747 (1976). However, this argument was explicitly rejected in the Report:

> On the other hand, these practical problems are essentially procedural rather than substantive, and the proposal for a special exemption to preserve common law rights equivalent to copyright in unpublished advertising material cannot be justified.

*Id.*

■ Thus, Philips–Miller's misappropriation claims are preempted by section 301.[6] Because there are no allegations that Philips–Miller registered a copyright for its proposal, Counterclaim I is dismissed without prejudice. However, that does not leave the Defendant without a remedy. To the contrary, we find that their quasi and implied contract claims are not preempted.

### 2. *Contract Claims*

■ The parties agree that the cited cases stand for the proposition that claims similar to Counterclaims II and III, quasi and implied contract, which are in the nature of claims for unjust enrichment, are not equivalent to rights protected by the Copyright Act and are not preempted by section 301. *See, e.g., Weigel,* 83 C 7921, 1985 WL 2360 (N.D.Ill. filed Aug. 21, 1985) (quasi contract action was essentially a claim for unjust enrichment and thus not equivalent to rights protected under Copyright Act).[7] We agree, and find that Philips–Miller's contract claims are not preempted.

### II. *The Merits of Philips–Miller's Counterclaims*

Finally, we turn to the original basis for Searle's motion. Searle argues that sum-

---

6. We also reject Philips–Miller's argument that its misappropriation claim is not preempted because it involves a breach of a confidential relationship. We find that this "extra element" is not sufficiently different in kind from those required under the Copyright Act. *See* 17 U.S.C. § 301; *Rand McNally,* 591 F.Supp. at 739 (additional "commercial immorality" element of Illinois misappropriation tort is insufficient to defeat preemptive effect of section 301).

7. The only exception to this we have found holds that a claim for unjust enrichment was preempted without analysis or explanation, presumably because it was plead in the same count with a claim for misappropriation. *See, CEO Marketing,* 739 F.Supp. at 1152 (count alleging misappropriation **and** unjust enrichment preempted).

mary judgment must be granted for two reasons: (1) Philips–Miller's proposal was not new or novel; and (2) McAdams independently developed its "Patients in Compliance" program. These arguments can be dealt with summarily. Because we find that genuine issues of material fact abound as to these two claims, the motion for summary judgment is denied.

### A. Novelty

Searle's first argument is that the idea of calling patients to remind them to take their medicine has been around for many years. In support of this Searle offers literature and deposition testimony to the effect that similar ideas has been discussed in the industry before. Philips–Miller responds first that their particular program was novel because it had many unique features, and second that whether their March, 1990 program was novel or unique is a question for the jury to decide. We agree.

■ On strikingly similar facts, the court in *Shaw Advertising v. Ford Motor Co.*, 112 F.Supp. 121 (N.D.Ill.1953) (Campbell, J.), found the issue of novelty "must be preserved for determination by a jury." *Shaw*, 112 F.Supp. at 123. In order to determine if the March, 1990 proposal was novel or unique, this court would have to compare it side by side with earlier ideas of a similar nature. That is clearly a factual inquiry. The mere fact that someone may have proposed the idea of calling patients to remind· them to take their medication does not mean the March, 1990 proposal was not unique. Concommitantly, neither does the fact that Philips–Miller proposal had some features that earlier proposals lacked clearly make the Philips–Miller proposal novel. Though Philips–Miller has provided a chart that compares certain aspects of its March, 1990 program with other similar proposal, whether those differences make Philips–Miller's program novel or unique is a question of fact which we may not decide at this stage. Searle's motion for summary judgment, on the basis that Philips–Miller's March, 1990 proposal was not novel or unique is denied.[8]

### B. Independent Development

Searle also argues that there is uncontradicted proof that McAdams independently developed its "Patients in Compliance" program without access to Philips–Miller's March, 1990 proposal. Searle cites several cases where uncontradicted proof of independent development was sufficient to defeat similar claims. *See, e.g., Kienzle v. Capital Cities/American Broadcasting Co.*, 774 F.Supp. 432 (E.D.Mich.1991); *Roberts v. Dahl*, 6 Ill.App.3d 395, 286 N.E.2d 51 (1972).

■ Unlike the cases cited by Searle, however, where there was no proof that the alleged infringer had access to the plaintiff's materials, there is no question that the Defendant in the present case had access to Philips–Miller's March, 1990 proposal. The only remaining question is whether Searle shared it with McAdams.

In *Dahl*, the court held that an inference of copying arises from similarity between items. 286 N.E.2d at 55. Further, access to material can be inferred from substantial similarity. *Id.* However, uncontradicted proof of independent development by the alleged infringer will defeat the plaintiff's claim. *Id.* Thus, the question here is whether Searle shared Philips–Miller's proposal with McAdams or whether McAdams developed the ideas underlying it August, 1991 proposal independently.

There can be no question here that there is "substantial similarity" between Philips–Miller's March, 1990 proposal and the McAdams August, 1991 proposal. (*See* Def.'s Local Rule 12(m) Statement at ¶ 48.) Philips–Miller's side-by-side comparison between the two proposal is stunning in its effectiveness. While some of the similarities can be ascribed to coincidence or to standard industry practice, others certainly raise an inference of copying.

---

8. Philips–Miller makes a rather unfocused argument in its response to the motion. It seems to argue that proof of novelty is not required, but that access to the proposal by Searle somehow barred them from using similar ideas in the future from any other source, even if independently developed, unless Philips–Miller was compensated. This argument, made without any supporting authority, is both confusing and unconvincing.

The following excerpts from the proposals illustrate the similarity dramatically. Philips–Miller's March, 1990 proposal contains the following statement.

> Patient compliance is currently an issue of extreme concern in primary care medicine. Like the weather, everyone talks about it, knows it is important, but no one seems to know what to do about it.

(Def.'s Ex. 1 at 3.) McAdams August, 1991 proposal contains the following statement:

> Hypertension compliance is like the weather: everybody talks about it, but nobody seems to be doing anything about it.[9]

(Def.'s Ex. 2 at 1.). The phone numbers for both proposals were also the same: 1–800–CALAN–SR. (Def.'s Ex 1 at 15; Def.'s Ex. 3 at 2, ¶ 5.) Further, ad copies for both programs featured a phone receiver dangling from its cord. (Def.'s Ex. 1 at App. A; Def.'s Ex. 6).

We find that the substantial similarity between the proposals justifies an inference that Searle shared Philips–Miller's proposal with McAdams. Searle argues that its uncontradicted evidence that McAdams independently developed its August, 1991 proposal defeats that inference. Searle's evidence of independent development consists of the testimony of several Searle and McAdams employees to the effect that (1) No McAdams employees ever saw the Philips–Miller proposal until this litigation began; and (2) McAdams employees came up with their program on their own.

Philips–Miller's attempt to rebut this evidence runs the spectrum from the valid to the ridiculous. At the ridiculous end[10] is Philips–Miller's suggestion in its Rule 12(n) statement that because Chuck Fry, a Searle executive with access to the March, 1990 proposal, was friendly with Eugene Fine of McAdams and knew that McAdams needed new ideas to justify its large retainer with Searle, Fry viewed Fine as a "friend in need," and provided Fine with the details of the Philips–Miller proposal. (Def.'s 12(n) Statement at ¶¶ 54–64.) No facts are plead to support this wild hypothesis. This "friend in need" argument is a bridge of matchsticks that cannot sustain Philips–Miller's burden in this case. It is ridiculous speculation and we discard it summarily.

Despite Philips–Miller's persistent habit of using their 12(n) statement for argumentation, Searle's proof of independent development is hardly "iron clad." To the contrary, Philips–Miller does raise some valid points about the credibility of Searle's witnesses on independent development.

When questioned about the source of the quote about the weather in the McAdams proposal, Irving Schwab, the McAdams employee who made the proposal, testified that he saw the quote in a medical journal. (Def.'s Ex. 24, Schwab Dep.Tr. 27–28, 31–32.) However, Schwab was apparently unable to find the reference in the journal, and decided he had seen the quote in some promotional material from a company called Xenejenex. (Def.'s Ex. 8, letter from counsel for Searle.) The Xenejenex material does not contain the quote either. (Def.'s Ex. 9.)

Further, Schwab claims to have presented a similar idea about calling patients to remind them to take their medication to CIBA–Geigy in 1987. (Def.'s Ex. 24 at 81–85.) However, that testimony is contradicted by Schwab's other testimony about his belief that the calling program was "new," "unique," and never done before. (Def.'s Ex. 24 at 8, 11.) It is also contradicted by the affidavit of a CIBA–Geigy official that Schwab's presentation in 1987 involved pharmacies calling patients when their prescrip-

---

9. At this stage, we reject Searle's argument that because the quote about the weather was clearly not Philips–Miller's invention, its use by McAdams is meaningless. That argument misses the point. Philips–Miller does not contend that it coined the saying about the weather. Rather, they argue that its use in the unique context of a patient compliance program by both proposals is evidence that one was copied from the other.

10. Also at the ridiculous end is Philips–Miller's Rule 12(m) statement that "There is sufficient evidence to raise a factual issue as to whether or not McAdams had access to Philips–Miller's idea before it re-represented the idea to Searle in 8/91." (Def.'s Local Rule 12(n) Statement at ¶ 51.) This argumentative assertion has no place in a Rule 12(n) statement, which is meant to provide "any additional facts which require the denial of summary judgment." Local Rule 12(n).

tions were about to expire to remind them to refill them, not drug companies calling patients to remind them to take their medicine. (Slater Aff., Def.'s Ex. 19.)

■ Thus, Searle's evidence of independent development is insufficient to rebut the inference of copying/access that arises from the substantial similarity of the two programs at this stage of the litigation because we find their are issues of fact about its credibility. Credibility determinations may not be made by this court on summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1041 (7th Cir.1993) (citations omitted) ("On summary judgment, a court can neither make a credibility determination nor choose between competing inferences.") Again, we turn to Judge Campbell's opinion in *Shaw:*

> Any decision at this time would be based in large measure upon the answers to two questions: Was plaintiff's advertising plan novel and unique?, and, if the answer is in the affirmative, Was the advertising plan later used by defendants based upon and copied from plaintiff's plan? In order to answer these questions, the court must compare a series of advertising slogans and pictures. Such a comparison, and the resultant findings of fact, must be made at trial, and not on a motion for summary judgment.

*Shaw,* 112 F.Supp. at 123 (citations omitted).

### Conclusion

For the reasons stated above, Searle's Motion for Summary Judgment on the Counterclaims is denied. However, Philips–Miller's misappropriation claim is preempted by the Copyright Act and Count I of the Counterclaim is dismissed without prejudice.