889 So.2d 180 (2004)
MONTAGE GROUP, LTD., and Digital Editing Services, Inc., Appellants/Cross-Appellees,
v.
ATHLE-TECH COMPUTER SYSTEMS, INC., Appellee/Cross-Appellant.
No. 2D03-2026.
District Court of Appeal of Florida, Second District.
December 15, 2004.
*183 Arthur J. England, Jr., Charles M. Auslander, and Lisa L. Jama of Greenberg Traurig, P.A., Miami; Steven L. Brannock of Holland & Knight LLP, Tampa; and James W. Stoll of Brown Rudnick Berlack Israels LLP, Boston, MA, for Appellants/Cross-Appellees.
F. Wallace Pope, Frank R. Jakes, and Joseph J. Weissman of Johnson, Pope, Bokor, Ruppel & Burns, P.A., Tampa; and Stuart C. Markman, James E. Felman, Katherine Earle Yanes, and Robert W. Ritsch, of Counsel, of Kynes, Markman & Felman, P.A., Tampa, for Appellee/Cross-Appellant.
WALLACE, Judge.
On this court's own motion, the opinion dated October 13, 2004, is withdrawn and the following revised opinion is substituted therefor. The revisions consist of a correction of the name of one of the parties in section II.A., "The Parties' Claims," (2) an expansion of footnote 15, and (3) a change  in conformity with Athle-Tech's request for relief in the trial court  of the date from which prejudgment interest on the unjust enrichment award shall run. Otherwise the opinion is unchanged.
No further motions for rehearing will be entertained.
In this case we are called upon to address the aftermath of a business deal that began at a point where sports, technology, and commerce intersect. Montage Group, Ltd. (Montage) and Digital Editing Services, Inc. (DES),[1] appeal a final judgment awarding Athle-Tech Computer Systems, Inc. (Athle-Tech) over $14.1 million in damages and prejudgment interest on Athle-Tech's claims for breach of contract, tortious interference, and unjust enrichment. As a sanction for their multiple discovery violations, the trial court struck the Defendants' answers and affirmative defenses on the day the trial was scheduled to begin, and the case was tried before a jury on the issue of damages only. Montage and DES contend that the trial court erred in imposing the sanctions and that the jury's verdict is deficient in several respects. On its cross-appeal, Athle-Tech contends that the trial court erred in failing to grant its motion for prejudgment interest on the amount of the unjust enrichment award.
*184 We affirm the sanctions order. We agree with the Defendants that the jury's verdict is flawed. We affirm the final judgment in part, reverse it in part, and remand for the entry of an order of remittitur with respect to the award of damages against DES for unjust enrichment. On the cross-appeal, we direct that the amended final judgment to be entered on remand and after a new trial on damages for unjust enrichment, if necessary, shall include an award of prejudgment interest on the amount of the unjust enrichment award.

I. THE FACTS

A. Introduction

The dispute among the parties in this case stems from an alleged breach of a contract between Athle-Tech and Montage for the joint development, ownership, and licensing of a digital software computer program. In the 1990s, both companies were acknowledged leaders in their respective industries  Athle-Tech in the sports film editing business and Montage in the creation of digital film editing software. A brief profile of each company will be helpful to an understanding of the pertinent facts.

B. Athle-Tech

Athle-Tech was founded by Dr. Samuel G. Covault in 1986. Covault had been a football coach at Miami University (Ohio), Ohio University, Ohio State University, and the University of Connecticut. In the 1980s, Covault had developed a game analysis and video-editing computer system used by football coaches to review and analyze game films. The system included a game analysis software program, videocassette recorders, and computer equipment. Athle-Tech marketed these systems primarily to Division I college football teams and enjoyed substantial success in its market. Although Athle-Tech was a one-man business operated by Covault from his home in Pinellas County, it won recognition by a trade publication as one of the "Top 100 Value Added Resellers" engaged in reconfiguring and reselling microcomputer systems to end users.
The systems marketed by Athle-Tech were based on linear (analog) technology. In the early 1990s, Covault realized that the newer digital film editing systems already in use in the film and television industry would soon make obsolete his linear-based sports film editing system. Digital film editing systems offer significant advantages over analog systems in the speed at which editing can be performed. In response to this challenge to his existing business, Covault outlined the elements of a new digitally based system.[2] He also began to seek a business relationship with a company that had the ability to make his concept for a digitally based sports film editing system a reality.

C. Montage

After several unsuccessful approaches to other companies, Athle-Tech ultimately entered into such a business relationship with Montage, which was located in Keene, New Hampshire. Montage had previously developed digital film editing software known as "MServer" for use in the film and television industry. Montage's business was similar to Athle-Tech's in that it involved the reconfiguring and resale of microcomputer systems. Montage had also been very successful in its market. *185 The MServer software had won Oscar and Emmy awards for technical achievement. Covault met with officers of Montage initially in 1994, and the two companies began to negotiate a business deal for the development, ownership, and licensing of the digital software program necessary to the production of the digital sports film editing system envisioned by Covault.

D. The Software Development Contract

Although Athle-Tech and Montage negotiated and reviewed numerous documents proposed to memorialize their business relationship, the only document on which Athle-Tech would subsequently base its claims was a letter agreement dated January 1995 for the development of the game film editing software, a necessary component of the proposed system.[3] The letter agreement provided that Montage would undertake the development of a GUI (General User Interface) for football coaches, as defined in a design document provided by Covault entitled "Coach's GUI for Athle-Tech/Montage Non-Linear Video Editing."[4] Pursuant to the letter agreement, each party was to own a one-half interest in the software once it was completed, each was obligated to pay one-half of the development costs, and each was obligated to pay the other fifty percent of the proceeds of all sales of licenses of the Coach's GUI software. Montage was also to deliver to Athle-Tech a complete copy of the source code for the software.[5] The letter agreement provided further that neither party would sell, loan, disclose, or otherwise distribute to any party the source code for the program or any derivative versions of it.

E. Unresolved Issues

The letter agreement left unresolved two issues critical to the business relationship between Athle-Tech and Montage. First, the letter agreement provided that the parties would share equally in the sale of the proceeds from the sale of licenses for the Coach's GUI software. However, neither Athle-Tech nor Montage was in the computer software business. Both companies were in the business of the reconfiguring and resale of microcomputer systems. Coach's GUI and its derivatives were never intended to be sold as separate software products. On the contrary, Coach's GUI and its derivatives would be sold only as one component of larger systems that included computer hardware, other software, peripherals and related installation, and training and support services. In the letter agreement, the parties estimated the retail price of a license for Coach's GUI at $5,000. The sales price of a complete system could be hundreds of thousands of dollars. Although Montage contended that the letter agreement was not binding, the parties would subsequently dispute whether Athle-Tech's right to one-half of the proceeds was to be calculated based on the portion of the system price properly allocable to the value of the Coach's GUI software or the price of an entire system. It is not surprising that Montage subsequently argued in favor of *186 the former basis for the calculation while Athle-Tech contended for the latter.
Second, the letter agreement did not settle the nature of the business relationship between the parties. It would become apparent from later litigation that Athle-Tech viewed the digital game film editing project as a joint venture in which it was a full partner with Montage. Montage envisioned Athle-Tech's role as merely an independent distributor of the digital sports film editing system that it had under development. The unresolved issues in the documentation of the parties' business relationship set the stage for the dispute that followed.

F. The Implementation of the Agreement and Subsequent Events

After the letter agreement was signed in January 1995, Montage began the development of the Coach's GUI software. The development project proved to be far more expensive and time-consuming than either of the parties had anticipated. In the letter agreement, Montage had estimated the cost of developing the software at approximately $45,000 and expressed its expectation "to complete a version 1.0 release of this product around April 1, 1995." In fact, the development of Coach's GUI was not completed until sometime in 1998. The former president of Montage claimed at trial that its development and marketing costs for the project exceeded $2 million. Athle-Tech paid a total of $23,000 toward the cost of developing the Coach's GUI software.
The delays in the development of the software contributed to tension in the relationship between Covault and personnel at Montage. This tension was exacerbated by Montage's efforts to further negotiate its relationship with Athle-Tech. After the letter agreement was signed, Montage proposed to Covault an arrangement whereby Montage would retain ownership and control of Coach's GUI and Athle-Tech would sell the sports film editing systems as an independent distributor for Montage. Pursuant to this proposed arrangement, Montage would pay Athle-Tech the sum of $7500 on each sale of a license for Coach's GUI. On behalf of Athle-Tech, Covault rejected all such proposals from Montage. In November 1995, Seth Haberman and David H. Engelke, who were officers of Montage, met with Covault at his home in Clearwater, Florida, in an effort to find a basis upon which the parties could resolve their differences and go forward with the project. Although the meeting was unsuccessful, the parties continued to have limited contacts until mid-1997. At that point, Seth Haberman told Covault that Montage was "getting out of the sports business."

G. The Montage Sale to DES

In May 1997, David H. Engelke, together with his brother Brian Engelke, formed DES. In 1998, Montage completed the development of the Coach's GUI software. By then, Montage had renamed the software product "Omega." In April 1999, Montage sold its sports-related business  including Omega  to DES for $500,000. If the letter agreement between Athle-Tech and Montage was valid, this sale violated the letter agreement's prohibition against the sale to third parties of the source code for the Coach's GUI software or its derivative products. Furthermore, Montage failed to deliver a copy of the source code for the completed software product to Athle-Tech as required by the letter agreement.
From April 1999 until March 2000, when it was acquired by Pinnacle Systems, Inc. (Pinnacle), DES sold a number of digital sports film editing systems. One of the first sales was to the Seattle Seahawks professional football team. Positive comments *187 from the Seahawks' coaching staff generated interest in DES' systems, and additional sales to both professional and college football teams resulted. DES also acquired the rights to another sports film editing product. This acquisition added to DES' line of products. DES had multiple employees and operated a plant in Orlando, Florida, for the assembly of its computer products.

H. Pinnacle's Acquisition of DES

On March 30, 2000, Pinnacle, a publicly traded company, acquired all of the shares of DES from its shareholders, David H. Engelke and Bryan Engelke, for $300,000 in cash and 287,000 shares of unregistered Pinnacle stock. On the closing date, the Pinnacle shares were valued at $9.1 million. The terms of the deal included a provision for an earnout payable to the shareholders based upon the operating profits of the company during the first year after the acquisition.[6] At the time of trial, the Engelke brothers were involved in an arbitration proceeding with Pinnacle concerning the amount of the earnout.
In April 2000, Pinnacle acquired all of the shares of Montage. Two months later, Pinnacle also acquired Avid Sports, Inc.  DES' main competitor in the sports market  for shares of Pinnacle valued at $24 million.

II. ATHLE-TECH'S LAWSUIT AGAINST MONTAGE AND DES

A. The Parties' Claims

In May 2000, Covault learned about Pinnacle's acquisition of DES and Montage. Covault also learned that DES had been selling sports film editing systems that included a software product called "Omega." Covault suspected that Omega was Coach's GUI or a derivative thereof. Approximately three months later, Athle-Tech filed the action in the trial court against Montage and DES.
In its lawsuit, Athle-Tech asserted a claim against Montage for breach of contract, a claim against DES for tortious interference with Athle-Tech's contract with Montage, and a claim against DES for unjust enrichment based on DES' acquisition of the source code for Omega in violation of Athle-Tech's rights pursuant to the letter agreement with Montage. Montage and DES answered the complaint and raised various affirmative defenses, including a claim that the letter agreement between Montage and Athle-Tech was not binding because Covault had "marked-up" the document with numerous changes that had never been accepted by Montage. DES moved to dismiss the claims against it on the ground that they were preempted by the federal Copyright Act. The trial court ruled that Athle-Tech's claims against DES were not preempted and denied the motion. Montage and DES also initially denied that Omega was derived from Coach's GUI but stipulated before trial that Omega was in fact a derivative product of Coach's GUI.

B. The Entry of the Sanctions Order

In the three-week period immediately preceding the scheduled trial, the course of events revealed that the Defendants were guilty of multiple discovery abuses and other misconduct related to the discovery process. It would unduly lengthen this opinion to recite the details of the Defendants' *188 discovery violations and other misconduct here. However, it is fair to say that these violations were serious and had a substantial adverse impact on Athle-Tech's ability to meet the defenses on the liability issues mounted by Montage and DES. Athle-Tech moved for sanctions, and the trial court held two lengthy hearings on the motion. After the conclusion of the second hearing, the trial court struck the Defendants' answers and affirmative defenses, determined the liability issues to be established against the Defendants, and ordered the trial to proceed on the issue of damages only.

C. The Trial on Damages

At trial, Athle-Tech sought four distinct elements of damages. The first two elements, referred to as "the preacquisition proceeds" and "the postacquisition proceeds," were based on the provision of the letter agreement that entitled Athle-Tech to fifty percent of "the proceeds of all sales of licenses of the Coaches [sic] GUI software." The preacquisition proceeds represented the proceeds earned from April 16, 1999, the date DES acquired the Omega source code from Montage, to March 30, 2000, the date DES was acquired by Pinnacle. The postacquisition proceeds represented the proceeds earned after the acquisition of DES by Pinnacle.[7] The third element was a business damages claim.[8] Athle-Tech contended that Montage's failure to deliver the completed source code for Coach's GUI and its derivative products, including Omega, had destroyed its business. Athle-Tech sought to recover the damages it had sustained as a result of the destruction of its business. Athle-Tech pursued the recovery of these first three elements against both Montage and DES. The fourth element was asserted against DES only. It was a claim for the alleged unjust enrichment accruing to DES as a result of its improper acquisition of the source code for Coach's GUI and its derivative products, including Omega, in violation of Athle-Tech's contractual rights with Montage.

D. The Verdict

The trial court submitted the case to the jury with a special verdict form that had been proposed by Athle-Tech. The verdict form required the jury to enter separate awards for each of the four elements of damages requested by Athle-Tech. The Defendants objected to the form of the proposed verdict on several grounds, *189 including an objection that the verdict form contained two separate legends that invited the jury to award amounts as damages that would be overlapping or duplicative. With respect to the first three elements of damages Athle-Tech sought to recover from both Montage and DES, a legend on the verdict form said: "Calculate and enter your findings with respect to each of the above lines separately. The court is aware of the possible relationship between these findings. You should not concern yourselves in this regard." With respect to the fourth element of damages based on the unjust enrichment claim against DES only, another legend read: "Calculate and enter your findings with respect to unjust enrichment separately. The court is aware of the possible relationship between this finding and your other findings. You should not concern yourselves in this regard."
Both Athle-Tech's counsel and the trial court recognized that the use of this unconventional verdict form could result in the entry of damage awards that were duplicative or overlapping. Nevertheless, the trial court overruled the Defendants' objections to the verdict form, noting that the issue of duplicative or overlapping damage awards could be addressed by posttrial motion if necessary.[9]
The jury's verdict awarded Athle-Tech damages on its claims as follows:

 Preacquisition proceeds $ 860,695.00
 Postacquisition proceeds $ 971,586.25
 Business damages $ 2,909,562.50
 Unjust enrichment $ 8,900,000.00

The first three awards were against both Montage and DES. The award for unjust enrichment was against DES only.
After the jury returned its verdict, the Defendants moved to set aside the verdict, for a new trial, and for a remittitur. The Defendants raised various objections to the verdict, including the contention that some of the awards were duplicative. The trial court ruled that the awards were not duplicative and denied all of the Defendants' posttrial motions. The trial court subsequently entered a final judgment in accordance with the jury's verdict. In addition to the damage awards based on the jury's verdict, the final judgment included prejudgment interest on the awards for preacquisition proceeds and postacquisition proceeds. The trial court denied Athle-Tech's motion for prejudgment interest on the business damages award and the unjust enrichment award. This appeal and the cross-appeal followed.

III. THE SANCTIONS ORDER
The Defendants challenge the trial court's order striking their answers and affirmative defenses and determining the issue of liability against them as a sanction for their abuses of the discovery process and violations of the court's orders. We review the sanctions order for abuse of discretion. See Mercer v. Raine, 443 So.2d 944, 946 (Fla.1983); Carr v. Reese, 788 So.2d 1067, 1070 (Fla. 2d DCA 2001).
The trial court conducted two hearings prior to the entry of the sanctions order. After the conclusion of the second hearing, the trial court entered a lengthy order with detailed findings of fact and conclusions of law, including a review of the six factors outlined in Kozel v. Ostendorf, 629 So.2d 817, 818 (Fla.1993). In its order, the trial court concluded that the Defendants' conduct warranted the most severe sanction *190 available and that no less severe penalty would be a viable alternative under the circumstances.
After a thorough review of the lengthy record in this case, we conclude that the trial court's findings of fact contained in the sanctions order are supported by competent, substantial evidence. In particular, the evidence supports the trial court's finding that the defendant corporations were complicit in most, if not all, of the conduct to be sanctioned. Cf. Jimenez v. Simon, 879 So.2d 13 (Fla. 2d DCA 2004) (reversing dismissal of action with prejudice as a sanction for discovery violations resulting solely from the neglect of counsel for plaintiff); Elder v. Norton, 711 So.2d 586 (Fla. 2d DCA 1998) (holding trial court abused its discretion in dismissing claim as a sanction for various discovery abuses absent evidence party assumed an active role in abusing the discovery process). We recognize that the sanction imposed by the trial court was the most severe available and that the consequences to the Defendants were grave. Nevertheless, the Defendants' discovery abuses and violations of the trial court's orders were egregious. The Defendants were responsible for creating the situation on the eve of the trial that made striking their pleadings and determining liability against them the only practical alternative available to the trial court. We find no abuse of discretion and affirm the sanctions order.

IV. THE FEDERAL PREEMPTION CHALLENGE BY DES
DES argues that the trial court erred in failing to grant its pretrial motion to dismiss Athle-Tech's claims against it for interference and unjust enrichment on the ground that they were preempted by the federal Copyright Act, 17 U.S.C. § 101 et seq. (2000). We consider DES' preemption challenge pursuant to a de novo standard of review. See Lipscher v. LRP Publ'ns, Inc., 266 F.3d 1305, 1318 (11th Cir.2001). We conclude that Athle-Tech's interference and unjust enrichment claims against DES were not preempted. The trial court properly denied DES' motion to dismiss based on federal Copyright Act preemption.
DES' preemption claim is based upon section 301 of the Copyright Act. In pertinent part, it provides:
(a) [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether [ ... ] published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.
Claims that may be enforced only under the Copyright Act may not be asserted in state court. See 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to ... copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states....").
Pursuant to section 301 of the Copyright Act, the courts have developed a two-step analysis to determine whether a state common law or statutory claim is preempted. The first step in the analysis is to determine if the rights at issue fall within the "subject matter of copyright" as set forth in sections 102 and 103 of the Act. The second step is to determine whether the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in *191 section 106. See Lipscher, 266 F.3d at 1311; Wrench LLC v. Taco Bell Corp., 256 F.3d 446, 453 (6th Cir.2001).
With respect to the second step of the analysis, rights within the general scope of copyright are those that prohibit reproduction, performance, distribution, or display of a work. 17 U.S.C. § 106; Lipscher, 266 F.3d at 1311. The courts employ the "extra element" test to determine whether the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright. Under this test, "if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright and there is no preemption." Foley v. Luster, 249 F.3d 1281, 1285 (11th Cir.2001) (quoting Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 716 (2d Cir.1992)). Thus a "state law claim is not preempted if the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim." Id. (quoting Computer Assocs.); see also All Pro Sports Camp, Inc. v. Walt Disney Co., 727 So.2d 363, 367 (Fla. 5th DCA 1999); Garrido v. Burger King Corp., 558 So.2d 79, 82 (Fla. 3d DCA 1990).
With these principles in mind, we turn to the examination of Athle-Tech's claims against DES for interference and unjust enrichment. However, before proceeding, we offer the cautionary note that "preemption in this case, as in any case of federal preemption of state law, is highly dependent upon the facts presented and the claims actually pled by the parties." Murray Hill Publ'ns, Inc. v. ABC Communications, Inc., 264 F.3d 622, 636 (6th Cir.2001).
Computer software programs such as Omega are protected by the Copyright Act. See Montgomery v. Noga, 168 F.3d 1282, 1288 (11th Cir.1999). Thus the first step in the preemption analysis is met. However, the second step is not satisfied. Athle-Tech's claims against DES were not based on the unauthorized reproduction, preparation, distribution, or display of the Omega software. The basis for the tortious interference claim was that DES, with knowledge of the contractual arrangements between Athle-Tech and Montage, had induced Montage to sell it the Omega source code and had otherwise interfered with Athle-Tech's rights under the letter agreement. This aspect of the interference claim provides the "extra element" that renders it qualitatively different from a copyright infringement claim. See Sturdza v. United Arab Emirates, 281 F.3d 1287, 1304-05 (D.C.Cir.2002). Similarly, Athle-Tech's claim for unjust enrichment was based on DES' improper acquisition of the source code from Montage. Thus the unjust enrichment claim also includes an "extra element" requiring proof of facts qualitatively different from the elements of copyright infringement. See Chesler/Perlmutter Prods., Inc. v. Fireworks Entertainment, Inc., 177 F.Supp.2d 1050, 1059 (C.D.Cal.2001); G.D. Searle & Co. v. Philips-Miller & Assocs., Inc., 836 F.Supp. 520, 526 (N.D.Ill.1993). For these reasons, Athle-Tech's claims against DES for interference and unjust enrichment were not preempted by the Copyright Act. The trial court properly denied DES' motion to dismiss these claims on preemption grounds.
We now turn our attention to an examination of the four separate damage awards.

V. THE DAMAGES AWARDS

A. The Award for Preacquisition Proceeds

The jury's verdict awarded Athle-Tech $860,695 in damages against Montage *192 (breach of contract) and DES (tortious interference) representing fifty percent of the proceeds of all sales of licenses of the Coach's GUI software (or derivatives thereof) prior to the sale of DES to Pinnacle. Athle-Tech was entitled to maintain an action for both breach of the software development contract and an action in tort for interference with the same contract. See Wright v. Nigh, 399 So.2d 515, 517 (Fla. 4th DCA 1981). The damages recoverable by each cause of action are overlapping but are not necessarily coextensive. See id.; Osheroff v. Rauch Weaver Millsaps & Co., 882 So.2d 503 (Fla. 4th DCA 2004). In this case, the elements of damages claimed by Athle-Tech against Montage for breach of contract and DES for tortious interference were identical.
Pursuant to the sanctions order, the liability of Montage and DES on Athle-Tech's claims was deemed admitted. Subject to their general challenges to the jury's awards as both duplicative and excessive, neither Montage nor DES contests the contract-based damages award in the amount of $860,695 for one-half of the preacquisition proceeds. This award was supported by competent, substantial evidence of the damages claimed, and we affirm it. The jury's award in the amount of $971,586.25 for one-half of the postacquisition proceeds is subject to different considerations and will be examined in a subsequent section of this opinion.

B. The Award for Business Damages

1. Introduction

The jury's verdict awarded Athle-Tech $2,909,562.50 in business damages against the Defendants based on Athle-Tech's nonreceipt of the source code for the Omega software. We conclude that the business damages award must be reversed because Athle-Tech failed to present legally sufficient proof of the claimed business damages to sustain the award.

2. Athle-Tech's Theory of Damages at Trial

Athle-Tech went to trial on the theory that the failure to deliver the Omega source code had destroyed its business. In the pretrial order, the issue was framed as follows: "Whether Montage's failure to deliver the completed source code for the software described in the letter agreement led to the destruction of Athle-Tech's business. If so, the amount of damages suffered by Athle-Tech as a result." Athle-Tech elaborated on its theory of damages in the pretrial order by describing the special damages it was claiming as "[d]amages from the destruction of its business due to Defendants [sic] failure to deliver the completed Coaches' [sic] GUI source code in the amount of $8.9 million plus prejudgment interest from March 31, 2000, until Final Judgment."[10]
The evidence Athle-Tech presented at trial concerning the fate of its previously successful sports film editing business was consistent with the theory of damages declared in the pretrial order. By 1996 or 1997, the market for analog sports film editing systems such as the one previously developed by Athle-Tech had disappeared. Potential customers wanted to purchase only the new digitally based systems that offered substantially better performance and ease of use. Athle-Tech made its last *193 sale of an analog system in 1997. By that time, Athle-Tech's financial resources were limited, the market for the only product it had to sell had disappeared, and it was by then too late for it to seek a partnership with another software developer in order to enter the digital market. In recognition of these facts, Athle-Tech's president, Dr. Sam Covault, testified that by 1997, Athle-Tech had "no market alternatives," and its business was destroyed.[11] Having reviewed Athle-Tech's theory concerning the business damages it sustained as a result of its nonreceipt of the Omega source code, we turn now to a review of the sufficiency of the evidence of loss Athle-Tech presented at trial to support the award.

3. Business Damages Proof

a. Introduction

At trial, Athle-Tech based its claim for business damages on the destruction of its business resulting from its nonreceipt of the Omega source code. If a business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the loss. Polyglycoat Corp. v. Hirsch Distribs., Inc., 442 So.2d 958, 960 (Fla. 4th DCA 1983). If the business is not completely destroyed, then it may recover lost profits. Aetna Life & Cas. Co. v. Little, 384 So.2d 213, 216 (Fla. 4th DCA 1980). A business may not recover both lost profits and the market value of the business. See Sostchin v. Doll Enters., Inc., 847 So.2d 1123, 1128 n. 6 (Fla. 3d DCA), review denied, 860 So.2d 977 (Fla.2003); Trailer Ranch, Inc. v. Levine, 523 So.2d 629, 631 (Fla. 4th DCA 1988).

b. The Evidence at Trial

Because Athle-Tech's theory of damages at trial was that the nonreceipt of the Omega source code had destroyed its business, the proper measure of its damages was the value of its business on the date the business was destroyed. According to Covault's testimony, the destruction of Athle-Tech's business occurred in 1997 when its inability to enter the digital market for sports film editing left it with "no market alternatives." Nevertheless, Athle-Tech presented no evidence of the value of its business in 1997 or at any other time.
Athle-Tech presented the testimony of its expert, Steven Oscher, in support of its various damages claims. Oscher, a certified public accountant, was qualified as an expert in the area of economic loss. Oscher testified that if one were to employ the "guideline company" approach[12] to *194 business valuation, the $8.9 million net value of the DES/Pinnacle transaction could be used as "an indicator of the value of what Athle-Tech would have been if it had been able to continue in existence." However, Oscher had not performed a business valuation of Athle-Tech's business. Although Oscher could have made such a post-mortem examination, he did not perform a business valuation because he was not engaged to do so. When pressed for clarification on cross-examination, Oscher admitted that he was not expressing an opinion that the lost value of Athle-Tech's business was $8.9 million. Thus Oscher's testimony on the question of value was limited to identifying a comparable indicator of value. Oscher did not perform the remainder of the extensive analysis that would have been necessary to arrive at an appraisal of the value of Athle-Tech's business at the time it was destroyed. Therefore, Oscher was unable to offer an opinion on the value of Athle-Tech's business. Athle-Tech did not offer any other evidence directed to the value of its business, and the Defendants did not offer any evidence on this issue. Because neither Oscher nor any other witness testified to the value of Athle-Tech's business on the date of its destruction, Athle-Tech's proof at trial was insufficient to establish the amount of the loss it sustained on account of the destruction of its business.

c. The Appellate Argument Based on Lost Profits

In closing argument, Athle-Tech's counsel asked the jury to award Athle-Tech $8.9 million, the net value of the DES/Pinnacle transaction, as business damages for Athle-Tech's nonreceipt of the Omega source code. The jury's award for business damages was $2,909,562.50, a substantially lesser amount. Although the parties have suggested to us a variety of interesting theories on the question, we have been unable to determine from the record how the jury arrived at this figure.
On this appeal, Athle-Tech advances a different theory in support of the business damages award. Discounting its expert's testimony about the net value of the DES/Pinnacle transaction as an "indicator of value," Athle-Tech argues that evidence in the record of the lost profits Athle-Tech sustained as a result of its nonreceipt of the Omega source code is sufficient to sustain the jury's award of slightly more than $2.9 million in business damages. This approach is inconsistent with the business destruction theory that Athle-Tech declared in the pretrial order and on which it tried its business damages claim.[13] Pursuant to Athle-Tech's appellate theory, one must assume that its business was crippled  but not destroyed  as a result of its nonreceipt of the Omega source code. Cf. Zinn v. GJPS Lukas, Inc., 695 So.2d 499, 500-01 (Fla. 5th DCA 1997) (holding that brine shrimp and tropical fish business was entitled to recover lost profits where business was greatly diminished but not destroyed by negligent pesticide spraying); Travelers Ins. Co. v. Wells, 633 So.2d 457, 462-63 (Fla. 5th DCA 1993) (holding that family-owned sawmill business was entitled to recover lost profits resulting from breach of contract to provide workers' compensation insurance *195 where sawmill continued to operate on a much reduced basis with family labor and also continued the retail sale of building supplies and hardware). Athle-Tech's lost profits argument is not based on expert witness testimony or documentary evidence that directly addressed the issue of Athle-Tech's anticipated lost profits. Instead, Athle-Tech relies on calculations made by Covault concerning the total sales of systems made by DES between 1999 and 2001 and estimates offered by Oscher of the gross profit margins experienced by DES on such sales in order to construct a lost profits rationale for the jury's award.
Athle-Tech's attempt to sustain the business damages award as the recovery of its lost profits fails because the evidence Athle-Tech relies on is far too uncertain and speculative to support an award of lost profits. The plaintiff bears the burden of proving an entitlement to lost profits. See Physicians Reference Lab., Inc. v. Daniel Seckinger, M.D. & Assocs., P.A., 501 So.2d 107, 109 n. 1 (Fla. 3d DCA 1987). In order for a business to recover lost prospective profits, it must prove not only that the defendant's action caused the damage but also that there is some standard or "yardstick" by which the amount of damages may be adequately determined. W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd., 545 So.2d 1348, 1351 (Fla.1989). At trial, Athle-Tech did not offer any projections or estimates of the sales it might have made if it had been able to enter the digital market. Instead, Athle-Tech asserts that the sales history and gross profit margins of DES provide the "yardstick" that could be used to measure the profits that Athle-Tech would have been able to make if it had received the Omega source code. However, this assertion is based upon the assumption that the businesses of Athle-Tech and DES were comparable and would have been operated in a similar manner. This assumption is not supported by the record. For purposes of his opinion testimony, Oscher assumed that the businesses of Athle-Tech and DES were comparable because he was instructed to do so by Athle-Tech's counsel. He made no independent study of the two companies to determine whether their businesses were actually comparable.
In fact, there were substantial dissimilarities between the two businesses. Athle-Tech was essentially a one-man operation that Covault ran out of his home. DES had a number of employees. DES also operated a manufacturing plant for the assembly of the hardware components of its systems. Athle-Tech had no such facility. Athle-Tech's plans were limited to the marketing of Omega-based systems. DES carried other product lines. Athle-Tech had restricted its sales efforts to Division I college football teams because Covault believed that the National Football League (the NFL) market would not be profitable. On the other hand, DES decided to pursue the NFL market and succeeded in selling expensive systems to several professional football teams. Given the substantial dissimilarities between the businesses of Athle-Tech and DES, conclusions about the profits Athle-Tech might have generated if it had been able to enter the digital market are entirely too speculative to support an award of lost profits. See U.S. Home Corp. v. Suncoast Utils., Inc., 454 So.2d 601, 605-06 (Fla. 2d DCA 1984); Sostchin, 847 So.2d at 1127-29; Sihle Ins. Group, Inc. v. Right Way Hauling, Inc., 845 So.2d 998, 1000-02 (Fla. 5th DCA 2003).

4. Summary

Athle-Tech's proof of its claimed business damages was inadequate to support the jury's business damages award. The *196 trial court erred in failing to grant the Defendants' motion for a directed verdict on the business damages claim. Accordingly, the portion of the final judgment representing the business damages award must be reversed. Our resolution of this issue makes it unnecessary for us to address the Defendants' argument that the business damages award and the unjust enrichment award are duplicative.

C. The Award for Unjust Enrichment

Athle-Tech's claim against DES for unjust enrichment was based upon DES' acquisition of the source code for the Omega software in violation of Athle-Tech's rights pursuant to the software development contract with Montage. In Circle Finance Co. v. Peacock, 399 So.2d 81, 84 (Fla. 1st DCA 1981), the First District described the basis of the equitable remedy of unjust enrichment as follows:
Unjust enrichment is characterized as the effect of a failure to make restitution for property received by one under such circumstances as to give rise to a legal or equitable obligation, thereby requiring such person to account for his retention of the property. Stated differently, the doctrine is a recognition that a person is accountable to another on the ground that if the former were not required to do so, he would unjustly benefit, or the other would unjustly suffer loss.
(Citations omitted.) In this case, DES' liability to Athle-Tech for unjust enrichment was deemed admitted by the sanctions order. Thus the focus of our inquiry is on the amount of the unjust enrichment award.
DES paid Montage $500,000 for the rights to the source code for the Omega software and other assets. The jury awarded Athle-Tech $8.9 million in damages against DES for unjust enrichment. The $8.9 million award was based on the net value of the sale of the Omega source code and other assets by DES to Pinnacle.[14] Athle-Tech argues that the $8.9 million award for unjust enrichment is fully justified by the disgorgement theory of damages. We agree with Athle-Tech that the application of the remedy of disgorgement was appropriate under the facts of this case. See Guyana Tel. & Tel. Co. v. Melbourne Int'l Communications, Ltd., 329 F.3d 1241, 1249 (11th Cir.2003); Mortellite v. Am. Tower, L.P., 819 So.2d 928, 935-36 (Fla. 2d DCA 2002) (Casanueva, J., concurring); Restatement of Restitution § 151 (1937).[15]
Nevertheless, we agree with DES that the trial court should have granted DES' posttrial motion for remittitur with respect to the unjust enrichment award. The trial court should have ordered a remittitur in the amount of $4.45 million in order to reduce the award by one-half, accompanied by the alternative grant of a new trial limited to the amount of damages on the unjust enrichment claim. This result follows directly from the fractional *197 nature of Athle-Tech's interest in the source code for the Omega software.
Pinnacle paid $9.4 million in cash and stock in order to acquire the entire interest in the source code for the Omega software. However, pursuant to its contract with Montage, Athle-Tech's interest in Omega was limited to fifty percent. The liability of one who acquires the entire interest in a property in violation of the rights of another entitled to a fractional interest in the property is measured by the value of the fractional interest wrongfully acquired, not the entire property. See Grossman v. Greenberg, 619 So.2d 406, 409 (Fla. 3d DCA 1993); Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 549 (1928). Therefore, the jury's award to Athle-Tech of one hundred percent of the net value of the DES sale to Pinnacle improperly failed to measure the award by the size of Athle-Tech's one-half interest in Omega. A court cannot allow a jury to award a greater amount of damages than what is reasonably supported by the evidence at trial. Rivard v. Gioia, 872 So.2d 947 (Fla. 5th DCA 2004); McCarthy Bros. Co. v. Tilbury Constr., Inc., 849 So.2d 7, 9 (Fla. 1st DCA), review denied, 857 So.2d 197 (Fla.2003). In this case, the maximum allowable award for unjust enrichment against DES was $4.45 million. Because the verdict for unjust enrichment against DES was excessive, the trial court erred in failing to order an appropriate remittitur. See Rivard, 872 So.2d at 947; McCarthy Bros., 849 So.2d at 9.
We find support for our conclusion in the principle that the purpose of restitution-based claims, such as unjust enrichment, is not punitive. The authors of the Restatement of Restitution state:
Actions for restitution have for their primary purpose taking from the defendant and restoring to the plaintiff something to which the plaintiff is entitled, or if this is not done, causing the defendant to pay the plaintiff an amount which will restore the plaintiff to the position in which he was before the defendant received the benefit. If the value of what was received and what was lost were always equal, there would be no substantial problem as to the amount of recovery, since actions of restitution are not punitive.
Restatement of Restitution, introductory note to ch. 8, Topic 2, at 595-96 (1937). If DES were required to pay to Athle-Tech damages equal to the entire net value of the DES/Pinnacle transaction, the result would be punitive because Athle-Tech was only entitled to a one-half interest in Omega. The payment by DES to Athle-Tech of $4.45 million will restore Athle-Tech to the position it occupied before DES acquired Omega. The recovery of a greater amount would result in an unwarranted windfall profit to Athle-Tech.
Athle-Tech points out that the contract prohibited both parties from selling, loaning, disclosing, or otherwise distributing the Omega source code to others "without the joint written consent of both parties." It is undisputed that David Engelke, an officer and shareholder of DES, had knowledge of this provision. Athle-Tech argues that because DES knowingly and intentionally interfered with the contract by buying the Omega source code without Athle-Tech's permission, it should receive one hundred percent of the net value of the DES/Pinnacle transaction, not fifty percent. We are unpersuaded by this argument. The contractual provision prohibiting a transfer of the Omega source code to a third party without Athle-Tech's written permission did not enlarge the extent of Athle-Tech's ownership interest in the event of a sale. Therefore, despite the contractual provision, Athle-Tech's interest in the Omega source code was limited to fifty percent, and the measure of its recovery for DES' improper acquisition of *198 the Omega source code was limited accordingly.[16]

D. The Award for Postacquisition Proceeds

1. The Defendants' Arguments

The Defendants argue that the jury's award in the amount of $971,586.25 for one-half of the postacquisition proceeds is duplicative of both the business damages award in the amount of $2,909,562.50 and the unjust enrichment award in the amount of $8.9 million. For the reasons already stated, we have determined that the business damages award cannot be sustained. Therefore, it is unnecessary to address the Defendants' duplicative damages argument as it relates to the business damages awards. In addition, for the reasons previously stated, we have determined that an order of remittitur must be entered on remand as to the unjust enrichment award. Thus it appears that the unjust enrichment award will survive in some form unless Athle-Tech declines to accept the remittitur and suffers a zero verdict in a new trial on damages on its unjust enrichment claim. Therefore, we are obliged to address the duplicative damages argument as it relates to the award for unjust enrichment. This issue is only pertinent to DES because Athle-Tech did not assert a claim for unjust enrichment against Montage.

2. Events at Trial

Steven Oscher, Athle-Tech's expert on economic loss, testified that the net value of the DES/Pinnacle transaction could be "an indicator" of Athle-Tech's loss resulting from its nonreceipt of the Omega source code. In Oscher's opinion, it would have been improper to add the amount of the postacquisition proceeds to the net value of the DES/Pinnacle transaction in order to measure the loss Athle-Tech sustained as a result of its nonreceipt of the Omega source code. Oscher explained that "[t]o do so would have been double counting.... [I]t's not an additive issue."
At the jury charge conference, the Defendants' counsel objected to the verdict form proposed by Athle-Tech's counsel on the ground, among others, that it created a potential for a double or overlapping recovery with respect to the postacquisition proceeds claim and the other claims based on the net value of the DES/Pinnacle transaction.[17] The trial court overruled counsel's objection and adopted the verdict form, observing that Athle-Tech was "only entitled to one recovery." The trial court's remark implied that a double or overlapping recovery, if any, would be eliminated posttrial. Nevertheless, after the return of the verdict, the trial court denied the Defendants' posttrial motion, ruling that it did not find "any duplication in the amounts awarded by the jury's verdict."

3. Analysis

As Oscher testified and the trial court and the parties' counsel acknowledged during the charge conference, an *199 award of damages to Athle-Tech measured by the net value of the DES/Pinnacle transaction necessarily included the amounts that would be earned by DES after its acquisition by Pinnacle. Thus a recovery of damages that included both the value of DES' business and its future earnings would necessarily be duplicative or overlapping. A party may not recover damages that reflect both the value of its business and lost profits. See Sostchin, 847 So.2d at 1128 n. 6; Trailer Ranch, Inc., 523 So.2d at 631. The prohibition against the recovery of damages for both the value of a business and lost profits is based on the principle that a business's value reflects its future profits. This principle applies with greater force to the facts presented in this case because the postacquisition proceeds represented gross profits, not net profits.
A double recovery based on the same element of damages is prohibited. Atl. Coast Line R. Co. v. Saffold, 130 Fla. 598, 178 So. 288, 290 (1938); Besett v. Basnett, 437 So.2d 172, 173 (Fla. 2d DCA 1983). Accordingly, on remand the trial court must reduce or eliminate the postacquisition proceeds award against DES to eliminate any duplicative recovery of damages against DES based on the unjust enrichment claim.
The unjust enrichment award was against DES only-not Montage. Therefore, as to Montage, the postacquisition proceeds award is not duplicative of the unjust enrichment award, and we affirm the postacquisition proceeds award against Montage. However, because the $971,586.25 amount of the postacquisition proceeds award, plus interest, is subsumed within the amount of the unjust enrichment award, Athle-Tech shall be entitled to only one satisfaction from the Defendants based on these two awards to the extent of $971,586.25, plus interest. See Mitchell v. Edge, 598 So.2d 125, 127-28 (Fla. 2d DCA 1992); Lutheran Bhd. v. Hooten, 237 So.2d 23, 25 (Fla. 2d DCA 1970); Diamond R. Fertilizer Co. v. Lake Packing P'ship, 743 So.2d 547, 550 (Fla. 5th DCA 1999).

VI. PREJUDGMENT INTEREST ON UNJUST ENRICHMENT AWARD
On its cross-appeal, Athle-Tech argues that the trial court erred in failing to grant its motion for prejudgment interest on the unjust enrichment award. We agree. Under the circumstances of this case, Athle-Tech was entitled to prejudgment interest on $4.45 million  or if it refuses to accept the remittitur, on whatever amount it may ultimately be entitled to recover for unjust enrichment  from March 29, 2000, the date Pinnacle acquired DES. See Argonaut Ins. Co. v. May Plumbing Co., 474 So.2d 212, 215 (Fla.1985); Burr v. Norris, 667 So.2d 424, 426 (Fla. 2d DCA 1996). See also Restatement of Restitution §§ 156, 157.
In support of their argument against an award of prejudgment interest on the unjust enrichment award, the Defendants rely on this court's decision in Perdue Farms, Inc. v. Hook, 777 So.2d 1047 (Fla. 2d DCA 2001). We find our prior decision to be distinguishable. In Perdue Farms, we concluded that prejudgment interest was not available on the award of damages for unjust enrichment because the "damages could not be liquidated to the date selected by the jury ... or any other date certain." Id. at 1054. In this case, the damages for unjust enrichment can be liquidated to April 16, 1999, the date DES acquired the Omega source code from Montage. Therefore, Perdue Farms is not controlling.
We have considered the other arguments advanced by the Defendants in opposition to the various awards for damages and find them to be without merit.

*200 VII. CONCLUSION

We summarize our holding as follows: We affirm the sanctions order that struck the Defendants' answers and affirmative defenses, that determined the allegations of Athle-Tech's complaint to be admitted, and that ordered a trial on the issue of damages only. With respect to the final judgment, we affirm the award of preacquisition proceeds in the amount of $860,695. The trial court must reduce or eliminate the postacquisition proceeds award against DES to eliminate any duplicative recovery of damages against DES based on the unjust enrichment claim. We affirm the postacquisition proceeds award against Montage, but Athle-Tech shall be entitled to only one satisfaction from Montage and DES based on the postacquisition and unjust enrichment awards to the extent of $971,586.25, plus interest. We reverse the business damages award in the amount of $2,909,562.50. We also reverse the $8.9 million award for unjust enrichment. On remand, the trial court shall enter an order for a remittitur of the unjust enrichment award in the amount of $4.45 million in order to reduce that award by one-half, coupled with the alternative grant of a new trial limited to the amount of damages on the unjust enrichment claim. Finally, the amended final judgment to be entered on remand and after a new trial on damages for unjust enrichment, if necessary, shall include an award of prejudgment interest on the amount of the unjust enrichment award.
Affirmed in part, reversed in part, and remanded.
NORTHCUTT and STRINGER, JJ., Concur.
NOTES
[1] We will refer to the appellants/cross-appellees individually as "Montage" and "DES" and collectively as "the Defendants."
[2] Covault's new design was for a system with a football application. However, digital sports editing systems are adaptable to other team sports, including baseball, basketball, hockey, and soccer.
[3] The Defendants would later contend that the letter agreement was not a binding contract.
[4] The parties initially referred to this software product as "Coach's GUI" and "Athle-Tech Digital Analysis Coach's Interface (ADACI)." Montage would later rename the software "Omega."
[5] "Source code" may be defined as "[c]ode written by a programmer in a high-level language and readable by people but not computers. Source code must be converted to object code or machine language before a computer can read or execute the program." The American Heritage Dictionary of the English Language 1662 (4th ed.2000).
[6] An "earnout" or "earn-out" provision in a contract for the acquisition of a business provides that the seller is to obtain additional future compensation based on the business achieving certain future earnings levels or other goals. See A Dictionary of Business 180 (3d ed. Oxford Univ. Press 2002).
[7] The correct interpretation of the term "proceeds" as used in the letter agreement was a contested issue in the trial court. The letter agreement entitled Athle-Tech to fifty percent of "the proceeds of all sales of licenses of the Coaches [sic] GUI software." Athle-Tech argued that it was entitled to fifty percent of the proceeds from the sale of complete systems. The Defendants argued that Athle-Tech's claim was limited by the plain meaning of the letter agreement to fifty percent of the proceeds derived from sales of licenses of Coach's GUI.

Athle-Tech argued that the letter agreement was ambiguous and sought to present parol evidence to establish its meaning. The Defendants filed a motion in limine to exclude parol evidence to vary the terms of the agreement. The trial court ruled that the letter agreement was ambiguous and denied the Defendants' motion. Thus the parties presented evidence directed to the interpretation of the letter agreement and argued their respective interpretations of the letter agreement to the jury. The jury's award for the preacquisition and postacquisition proceeds reflects that it adopted Athle-Tech's view of the letter agreement. On appeal, the Defendants have not challenged the trial court's ruling on the parol evidence issue. Therefore, we are not called upon to decide the question.
[8] The parties have characterized this element variously as "the lost business opportunity" claim and "the lost profits" claim. In the interest of clarity and consistency, we will refer to it as "the business damages" claim.
[9] For an alternative approach to the preparation of verdict forms designed to eliminate duplicative and overlapping damage awards, see Trend Setter Villas of Deer Creek v. Villas on the Green, Inc., 569 So.2d 766, 767 (Fla. 4th DCA 1990), and Phillips v. Ostrer, 481 So.2d 1241, 1245 (Fla. 3d DCA 1985).
[10] Athle-Tech also sought the recovery of the $8.9 million net value of the DES/Pinnacle transaction on its claim for unjust enrichment. Athle-Tech's contract-based claims and unjust enrichment claim were based on the same evidence but proceeded on different legal theories. Athle-Tech asserted its contract-based claims against both of the Defendants. The claim for unjust enrichment was made against DES only.
[11] During the nine-year period from 1989 through 1997, Athle-Tech's federal income tax returns reflected that it had average annual revenues of $317,286. These annual revenues ranged from a high of $535,504 in 1991 to a low of $79,437 in 1996. In 1998 Athle-Tech had revenues of $161,787. This figure was comprised primarily of the gross receipts from the sale of a prototype of a digitally-based sports film editing system Athle-Tech had sold to the University of Missouri in 1997 with the cooperation of Montage. The revenues for 1999 and 2000 were $2000 and $6500, respectively. The revenue sources for 1999 and 2000 were payments on service and support contracts for existing systems, not new sales. These figures confirm Covault's testimony that Athle-Tech's business was destroyed by 1997.
[12] Oscher was apparently referring to the "guideline merged and acquired company" method of appraising the value of closely held companies. This method uses a market-based approach to appraise the subject company. The appraiser determines the value of the subject company or interests in it by comparison to the prices paid for similar companies that have been merged or otherwise acquired. See generally Shannon P. Pratt, Robert F. Reilly, & Robert P. Schweihs, Valuing a Business: the Analysis and Appraisal of Closely Held Companies 259-79 (2000). The method employed is to "derive indications of value from the prices at which entire companies or operating units of companies have ... changed hands." Id. at 260.
[13] Remnants of the business destruction theory survive in Athle-Tech's submissions to this court. Athle-Tech characterizes the injuries it sustained at the hands of the Defendants as "fatal." In addition, it declares that as a result of Montage's actions, "Athle-Tech ... was left to die."
[14] Pinnacle agreed to pay $300,000 cash and $9.1 million in stock plus an earnout to acquire DES ($300,000 plus $9,100,000 less $500,000 equals $8,900,000). The amount to be realized from the earnout was in dispute when the case went to trial, and the parties disregarded it for the purpose of calculating damages.
[15] For further explanation of the disgorgement remedy, see Daniel Friedmann, Restitution for Wrongs: The Measure of Recovery, 79 Tex. L.Rev. 1879, 1887-1903 (2001), and Ernest J. Weinrib, Restitutionary Damages as Corrective Justice, 1 Theoretical Inquiries L. 1, 12-18 (2000). Although the $8.9 million award for unjust enrichment necessarily included the value of products, product lines, and other business assets apart from the Omega software, Montage and DES have not argued this issue.
[16] Athle-Tech might have pursued a claim for damages against Montage for breach of the contractual prohibition against transfer of the Omega source code and DES for interference with it. Nevertheless, Athle-Tech did not present evidence at trial of damages to support such claims. The jury verdict form that was prepared by Athle-Tech and submitted to the jury did not include a blank for the award of such damages.
[17] The legend directly below the blank space for the amount of the unjust enrichment award against DES instructed the jury: "Calculate and enter your findings with respect to unjust enrichment separately. The court is aware of the possible relationship between this finding and your other findings. You should not concern yourselves in this regard."